Patricia J. HOLLIS

v.

**FLEETGUARD, INC., Larry Smith and Charles Huddleston, as agents of Fleetguard, Inc., and Glenn Jolly, individually, and in his capacity as agent of Fleetguard, Inc.**

No. 2–86–0010.

United States District Court,
M.D. Tennessee,
Northeastern Division.

June 24, 1987.

Onnie Winebarger, Byrdstown, Tenn., for plaintiff.

Daniel H. Rader, III, Moore, Jones & Rader, Cookeville, Tenn., for defendants.

## MEMORANDUM

MORTON, Senior District Judge.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, §§ 701, *et seq.*, 42 U.S.C. § 2000e, *et seq.*, for sexual harassment and retaliatory discharge.

The plaintiff was terminated on November 21, 1984. She alleges that her dismissal was an act of unlawful retaliation because of her reports of sexual harassment. Fleetguard, Inc., denies the plaintiff's claims entirely and submits that the plaintiff was discharged for poor work performance. The plaintiff also claims that she was subjected to sexual harassment in the form of a hostile work environment. For the reasons which follow, judgment shall be entered for the defendants.[1]

### I.

The plaintiff, a 33–year-old white female, was hired by Fleetguard on September 28, 1976, as a junior data entry clerk. In December of 1978 she was transferred to the traffic department as a freight billing clerk, where she remained until her termination. Larry Smith was the plaintiff's direct supervisor from sometime in 1983 through the date of her termination. Charles Huddleston's title in November 1983 was manager of organizational development, a branch of the personnel department. Smith and Huddleston jointly conducted the plaintiff's termination meeting. Glenn Jolly, the private fleet supervisor whom she accuses of sexual harassment, was her co-worker[2] in the traffic department.

The plaintiff's employment history was chiefly uneventful until the fall of 1983. She received satisfactory or better performance appraisals each year, as more fully addressed hereinafter. During the latter part of 1983 the plaintiff was in the process of obtaining a divorce, and she admitted making and receiving many telephone calls on company time. She was not, however, warned or disciplined for excessive personal telephone calls at that time.

Beginning in December 1983, on several occasions, Jolly invited the plaintiff to have a drink with him and some other employees after work.[3] She declined each time and did not report the invitations to any member of management. In February 1984 the traffic department was invited to a promotional dinner given by Yellow Freight Systems at the El Toro Restaurant in Cookeville. Following the dinner, the plaintiff remained to have a drink and talk with Jolly at his request. Jolly propositioned her, suggesting that they have a sexual affair. She turned him down and did not report the incident to any of her superiors at Fleetguard. She described one other specific instance of unwanted attention by Jolly in March 1984, when he requested that they share a ride back from

---

1. By stipulations filed April 9, 1987, the actions against Larry Smith and Charles Huddleston as individuals were dismissed without prejudice.

2. Glenn Jolly was never the plaintiff's supervisor, nor does she contend that she ever mistakenly thought he was.

3. Two other female employees of Fleetguard were also approached by Jolly with offers of his company. Estrella Terry was invited for drinks, and Donna Weill was asked to go for a plane ride. Both women declined and Jolly caused them no problems as a result of their rejections. Neither woman ever reported Jolly's conduct to her supervisor.

a meeting in Nashville.[4] Jolly never committed any offensive touching or other physical act of harassment toward the plaintiff. Shortly following the plaintiff's rejections, Jolly began to give the plaintiff less attention than his other co-workers and in general avoided contact with her. On a couple of occasions he refused to cooperate with her concerning problems with the in-bound freight list, explaining that he didn't have time. Once he yelled at her in the presence of others, which the plaintiff claimed intimidated her. Although the plaintiff argued that her job performance began to suffer because of Jolly's indifference to their working relationship, she still did not report any problems to management.

On April 6, 1984, the plaintiff was involved in an automobile accident with Jolly's son. In July 1984, when some problems arose regarding the payment of insurance benefits, the plaintiff told her ex-husband that the delay was probably due to the fact that she wouldn't have an affair with Jolly. Her ex-husband and Jolly had a heated telephone conversation in which the plaintiff claims Jolly denied asking her out and stated that he was going to stop helping her at work.[5] Although the plaintiff was unable to pinpoint a date, she asserts that in the following week she reported to Smith that Jolly was harassing her. Smith admits that the plaintiff talked with him about Jolly's advances sometime in late July or early August,[6] and that he asked her to allow him to keep the information confidential. At that time, he relayed the plaintiff's report to Huddleston with the view toward monitoring the situation, characterizing it as a potential problem. Although the plaintiff led Smith to believe that other female employees had experienced similar problems with Jolly, she refused to name them. Smith never documented the plaintiff's report of Jolly's conduct. In early or mid-August, she talked with Huddleston about Jolly's sexual interest in her. Huddleston requested that she allow him to investigate, but she declined. At a later date Jolly voluntarily came to Huddleston and denied that he had harassed the plaintiff.[7]

The plaintiff's job performance, which had always been ranked at least satisfactory, began to deteriorate in early 1984. Fleetguard utilizes an annual appraisal program whereby employees are rated on various components of their job description with an overall performance rating. The performance appraisal provides a basis for merit reviews in determining salary increases. During the plaintiff's 8-year tenure with Fleetguard, she received satisfactory or better appraisals each year. Her last review was written on March 9, 1984, by Larry G. Smith, her immediate supervisor, and in this review he noted that her "performance had exceeded normal expected performance for the year."[8] While the

---

**4.** The evidence regarding this episode of alleged harassment convinces the court that in reality the event was rather insignificant and resulted in no coercion or other mistreatment by Jolly. While Jolly may have mentioned to her the prospect of their riding back together *prior* to the trip, *after* the meeting the issue was settled with little discussion when Smith suggested the arrangement for seating on the ride home. Jolly made no counter suggestions or other comment when Smith proposed that the plaintiff ride with him and another employee ride with Jolly. Smith testified convincingly that the question of who rode back together was dealt with only briefly and in a nonchalant manner. Although the plaintiff rode back with Smith, she did not take the opportunity of the hour and a half of privacy with her supervisor to report any potential problem with Jolly.

**5.** His threat to stop helping her at work should not have been a traumatic ultimatum since the plaintiff knew he possessed no authority to discipline or demote her.

**6.** The reports about Jolly occurred *after* the plaintiff was counseled about her job performance as addressed *infra*.

**7.** Jolly was subpoenaed by both plaintiff and Fleetguard and appeared for trial but was not called to testify. He is not currently employed by Fleetguard, having resigned in October of 1986 to accept a position with a freight company in another town. There is no evidence that Jolly's resignation was in any way related to the instant lawsuit.

**8.** John Nolan, Smith's supervisor, testified that Smith had approached him sometime shortly after the performance reviews and told him he had made some mistakes in writing the reviews. The plaintiff's last appraisal, in March of 1984,

performance reviews indicate Fleetguard's overall satisfaction with the plaintiff's work, several of the appraisals note problems with her ability to interact and communicate with others and to accept criticism. Two of the reports note specific instances of misunderstandings with fellow employees. While performance appraisals are generally indicative of an employee's accomplishments, they are not entirely reliable in judging the true status of an employee's performance because of the natural and laudable human tendency to encourage improvement through praise rather than denigration. However, because of the plaintiff's good track record, the actions of the defendants have been scrutinized carefully, and their reasons for discharge are found to be legitimate. The court finds in this case that a formerly satisfactory employee developed poor work habits, lost interest in the quality of her work, and neglected to heed the warning signs of impending termination. Therefore, while the plaintiff's employment history has been considered as material and relevant to the issue of the reasons for her discharge, it is not fatal to the defendant's articulation of its justification for firing her as discussed fully hereinafter.

Beginning in March 1984, almost immediately after the plaintiff's annual evaluation, Smith began a six-month investigation of the plaintiff's job performance, initiated primarily due to input from co-employees regarding her poor work habits.[9] Several persons within the plaintiff's department approached Smith about her excessive phone calls, time away from her desk, and work simply not getting done. The accounting department contacted him several times with the plaintiff's billing mistakes. Smith came to work on at least 4 Saturdays to file bills of lading which were piling up because of the plaintiff's inefficiency. In 1983, the plaintiff completed her work satisfactorily without the necessity of overtime. In March, April, May and June of 1984, the plaintiff requested and was allowed to work overtime. Because the work was still not getting done, Smith allowed the plaintiff no overtime after June 1984. Her productivity was unmistakably on a downward turn.

During the summer of 1984, the plaintiff applied for two jobs within the company, both of which would have been promotions. She was not awarded either job. A co-worker, Betty Ballard, was upgraded one step above the plaintiff although she was lower in seniority. On July 19, 1985, the plaintiff caused a significant disruption when she learned that a co-worker had received a job for which she had applied. Operating solely upon a rumor, the plaintiff called a co-employee, Sherry Jones, to inform her that she (Jones) had been selected for the opening and to "congratulate" her. Management had not yet announced the employee who had been selected, and in fact the plaintiff had been misinformed. The plaintiff reacted angrily, speaking in a loud voice, involving a number of employees in the discussion, and preventing those around her from being able to work. The incident caused enough discord to require the attention of at least three members of management. Mike Yother, who was Huddleston's supervisor in the personnel department, telephoned Huddleston and Smith, who were away from the plant on that day, to advise them of the plaintiff's misconduct. The plaintiff admitted that the foregoing event occurred, but she dismissed it as a simple mistake which did not emanate from any ill will on her part.

The court judges the plaintiff's credibility to be poor. She admitted little responsibility for the obvious decline in her work performance, rejecting self analysis in favor of blaming others. The "congratulato-

---

was the first time Smith had written her review, having been her supervisor for less than a year.

9. Margaret Sams, who is no longer employed by Fleetguard, complained to Smith about the plaintiff's inefficiency. According to Sams, the plaintiff wasted time, spent excessive time on the telephone, was gone from her desk for long periods, and did not adequately perform her workload. Sams' assessment of the plaintiff's performance is accorded substantial weight, since she worked closely with the plaintiff and is not currently employed by Fleetguard, having resigned following a demotion. Sams' testimony was straightforward and unassuming.

ry" telephone call to Jones impels the court to label the plaintiff an outright troublemaker. Moreover, the plaintiff's EEOC complaint dated February 7, 1985, contains the following blatant inaccuracies which cast grave doubt upon the plaintiff's ability or desire to tell the truth. The plaintiff included a claim that *physical* conduct of a sexual nature occurred, an allegation which she recanted in a later deposition and at trial. She charged that the unwelcomed advances were made by her *supervisor*, constituting a false statement which was knowingly and intentionally made since the plaintiff was never of the mistaken impression that Jolly was her supervisor. The plaintiff's four-page undated letter to the EEOC describing the basis for her complaint states that Smith informed her that he would have to notify John Nolan, Logistics Manager, of her report. The plaintiff candidly admitted this falsehood, conceding that Smith actually told her he would work directly with the personnel department by talking with Huddleston. Nolan only learned of the plaintiff's sexual harassment claims about two weeks *after* her termination.

During the week following the Sherry Jones incident, on July 24, 1984, Smith met with the plaintiff privately regarding the general decline in the quality of her work and his concerns about others' perceptions of her. He documented the meeting and provided the plaintiff with a copy of his handwritten summary of the pertinent problems. The feedback provided by Smith to the plaintiff in this session was obviously in direct response to the plaintiff's intermeddling of the previous week and her poor job performance, and not, as the plaintiff suggests, a product of her reports about Jolly. The court specifically finds that the plaintiff decided to inform management of Jolly's propositions *after* her counseling session when she became uneasy about her job security.[10] Smith's four-page summary of their meeting would undoubtedly place a reasonable person on notice that his job was in jeopardy. In spite of this explicit warning, the plaintiff failed to improve her performance. In August or September of 1984, a job study performed by Claude Mooneyham indicated that the plaintiff's efficiency rating was only 66 percent,[11] and the plaintiff was again notified of the necessity of her improvement. The court finds that Smith orally communicated with the plaintiff about the distractions from her work at least twice before making the decision to terminate her employment.

On November 21, 1984, the plaintiff was discharged in a brief meeting with Smith and Huddleston because she had failed to upgrade her sinking job performance. Smith read a prepared statement to her discussing *inter alia* her lack of improvement and his willingness to assist her in preparing a resume and securing employment elsewhere. She was asked not to complete the day but to clear out her desk and leave immediately, in conformity with "company policy," according to Huddleston.

## II.

### A. *Hostile Work Environment*

The plaintiff's claim of sexual harassment shall be addressed first. A violation of Title VII may be predicated on either of two types of sexual harassment: harassment that involves the conditioning of concrete employment benefits on sexual favors (*quid pro quo* sexual harassment), and harassment that, while not affecting eco-

---

**10.** Additionally, her communications to management about Jolly's behavior when she finally decided to air her concerns were at worst a criticism of his lack of cooperation. When she notified Smith that Jolly had "asked her out" some three or four months after his initial advance, she declined to assist Smith in pursuing the matter by refusing to give him the names of women who were similarly approached. Throughout her testimony she characterized what she attempts to term "harrass-

ment" as "mine and Glenn's problem (sic)" or "our problem."

**11.** The plaintiff attempted to explain the low rating by noting that she was studied during a 4-day week. Smith's 9/10/84 note to the plaintiff informing her of the result shows, however, that the 32-hour week was taken into account in arriving at the efficiency rating.

nomic benefits, creates a hostile or offensive working environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, 56 (1986). It is the latter type of harassment, hostile working environment, to which the plaintiff claims she was subjected.[12] For sexual harassment to be actionable, it must be sufficiently severe or pervasive to "alter the conditions of [the victim's] employment and create an abusive working environment." *Vinson,* 477 U.S. at ——, 106 S.Ct. at 2405, 91 L.Ed.2d at 60, quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982). To prevail in a Title VII offensive work environment sexual harassment action, the plaintiff must prove:

(1) The employee was a member of a protected class.

(2) The employee was subject to an unwelcomed sexual harassment.

(3) The harassment was based on sex.

(4) The charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff.

(5) The existence of respondeat superior liability.

*Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–620 (6th Cir.1986).

■ For the following reasons, the court finds that the plaintiff has not carried the burden of proof in her claim of hostile work environment sexual harassment. First, Jolly's conduct toward the plaintiff does not rise to the level of actionable harassment. His interest in her and the approaches he made toward her (which total no more than three or four over the course of a four-month period) amounted to

undesirable propositions which she declined. She does not contend that she was shocked or distraught over the offers, but rather that his post-rejection behavior so affected her job performance that the work environment became hostile or offensive. The court does not doubt that Jolly was more difficult to work with after she declined his offers. However, while it is reasonable to assume that a scorned man would tend to avoid communicating with the former target of his affections as Jolly did in this case, the record is devoid of any evidence that he coerced, pressured, or otherwise abused her.[13] She complains generally that he ignored her and that as a result her job became more difficult. The Sixth Circuit has recently expounded on hostile work environment sexual harassment as follows:

Unlike *quid pro quo* sexual harassment which may evolve from a single incident, sexually hostile or intimidating environments are characterized by multiple and varied combinations and frequencies of offensive exposures, which characteristics would dictate an order of proof that placed the burden upon the plaintiff to demonstrate that injury resulted not from a single or isolated offensive incident, comment, or conduct, but from incidents, comments, or conduct that occurred with some frequency. To accord appropriate protection to both plaintiffs and defendants in a hostile and/or abusive work environment sexual harassment case, the trier of fact, when judging the totality of the circumstances impacting upon the asserted abusive and hostile environment placed in issue by the plaintiff's charges, must adopt the perspective of a reasonable person's reaction to a similar environment under

12. As merely a co-worker, Jolly was never in a position to decide whether the plaintiff was to be awarded or denied employment benefits such as salary increases, promotions, etc. Moreover, there is no evidence that Jolly attempted to influence members of management to terminate the plaintiff. Therefore, *quid pro quo* sexual harassment is inapplicable to these facts.

13. There was one occasion when Jolly raised his voice to the plaintiff in the presence of others. A person of reasonable sensibilities would not suffer unduly over one such incident. Additionally, if she felt she was being browbeaten she could have consulted with her supervisor or a member of personnel. The extent of her complaints to management were that Jolly had asked her out but that "she could handle it." *Cf. Highlander v. K.F.C. National Management Co.,* 805 F.2d 644, 650 (6th Cir.1986).

essentially like or similar circumstances. Thus, in the absence of conduct which would interfere with that hypothetical reasonable individual's work performance and affect seriously the psychological well-being ·of that reasonable person under like circumstances, a plaintiff may not prevail on asserted charges of sexual harassment anchored in an alleged hostile and/or abusive work environment regardless of whether the plaintiff was actually offended by the defendants conduct....

*Rabidue*, 805 F.2d at 620.

Under the totality of the circumstances herein, the plaintiff, as a reasonable person, should not have been, and in fact was not, seriously affected by Jolly's failure to communicate. His reluctance to interact in a working relationship with the plaintiff was childish and unprofessional, but it does not rise to the level of severity to constitute an actionable Title VII claim. Even if the plaintiff's version of Jolly's conduct is not as exaggerated as the court suspects it is, as her peer he had no control over her performance and the quality of her work. Without question, he had no involvement in the Sherry Jones fiasco or the stacked-up bills of lading her supervisor was forced to deal with, either of which were legitimate reasons to terminate her.

Additionally, even if the offensive working environment had been shown (and most clearly it has not), the plaintiff has failed to demonstrate respondeat superior liability in order to hold Fleetguard liable for Jolly's alleged harassment. The standard applied to co-workers who sexually harass states that an employer is liable only if it knew or should have known of the charged sexual harassment and failed to take immediate and appropriate corrective action. *See Yates v. AVCO Corp.*, 819 F.2d 630 (6th

Cir.1987). The plaintiff waited three to four months to advise Smith and Huddleston of Jolly's advances. When she finally reported that he had "asked her out," *not that he had sexually harassed her*, she refused to cooperate in an investigation by withholding the names of other women Jolly had propositioned. Although Smith was thoroughly wrong in asking the plaintiff to allow him to keep the information secret, had he not done so it is likely that she would have requested confidentiality. This assumption is buttressed by the fact that when Huddleston, acting properly as a responsible member of personnel, wanted to confront Jolly with her charges, the plaintiff urged him not to. She maintained that "she could handle the problem." Her vague allegations [14] coupled with her request for anonymity estops the plaintiff from claiming respondeat superior liability. Once a member of management attempted to explore the plaintiff's claim (as Huddleston did) and was asked not to by the plaintiff, she will not be heard to say that her employer was thereafter responsible for the hostility of her work environment.[15] On the whole, the court finds that the procedure followed, albeit meager, was "reasonably responsive to the employee's complaint," *Vinson*, 477 U.S. at ——, 106 S.Ct. at 2408, 91 L.Ed.2d at 62, largely because Smith and Huddleston were justified in not viewing the information as a "complaint" in light of the plaintiff's delay in reporting and her reluctance to initiate an investigation.

B. *Retaliatory discharge.*

The elements for establishing a prima facie retaliation claim are:

(1) that plaintiff engaged in an activity protected by Title VII,

---

**14.** Under this set of facts, the court does not find that Fleetguard management acted irresponsibly because they were not informed of any events constituting harassment. However, in most cases, a supervisor has a duty to investigate reported instances of sexual harassment, with or without an employee's consent. To his credit, Smith informed Huddleston of the plaintiff's allegations and they agreed to monitor the

situation. Jolly made no other advances after the plaintiff talked to Smith.

**15.** It is significant that the plaintiff reported past, not ongoing, activity. Jolly's current coolness and detachment which the plaintiff emphasized was at most distracting to the plaintiff, but is unwarranted to term his behavior as offensive or abusive.

(2) that the exercise of his civil rights was known by the defendant,

(3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and

(4) that there was a causal connection between the protected activity and the adverse employment action.

*Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). Once the plaintiff meets the initial burden of proving a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1818, 1824, 36 L.Ed.2d 668 (1973). If the employer does this, the plaintiff has the burden of proving that the articulated reason was false or pretextual. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The ultimate burden of persuading the trier of fact that the defendants intentionally discriminated (or retaliated) against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

The plaintiff contends that her discharge was an unlawful retaliation for her reports of Jolly's harassment. The defendants assert first that the plaintiff's account of Jolly "asking her out" was not a "protected activity" within the scope of 42 U.S.C. § 2000e–3, and second, that the plaintiff's deteriorating job performance was a legitimate nonretaliatory reason for her discharge.

■ Title VII's prohibitions on retaliation affords protection to two general types of activities, opposition and participation. Opposition is protected by the clause that prohibits employers from discriminating against an employee because he had opposed any practice made an unlawful employment practice by Title VII. The participation clause forbids discrimination against any employee because he has made

a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under Title VII. *See Croushorn v. Board of Trustees of University of Tennessee,* 518 F.Supp. 9, 21 (M.D.Tenn. 1980). Assuming the plaintiff's activities are protected, they must be classified as opposition rather than participation since she was not participating in any procedures related to Title VII at the time of her discharge. Because the plaintiff downplayed the seriousness of her allegations regarding Jolly's attraction to her in her communications with Smith and Huddleston when she finally involved management several months after the fact, and in light of her desire to avoid an investigation entirely at that time, the issue of whether these conversations constituted a protected activity of opposition to sexual harassment is a difficult one. However, since sexual harassment is obviously conduct which is prohibited by Title VII, and because the plaintiff's words were sufficient to alert Smith and Huddleston of a potential problem, the court finds that the plaintiff has satisfied the first two prongs of the four-prong test for unlawful retaliation. Naturally, the third prong exists since the plaintiff's subsequent discharge manifestly constitutes an adverse employment action. However, the plaintiff has failed to show a causal connection between the protected activity and the adverse employment action. This is not a case where the plaintiff was discharged hours, days, or even weeks after the exercise of her protected activity. *Cf. EEOC v. St. Joseph Paper Co.,* 557 F.Supp. 435 (W.D.Tenn.1983) (where plaintiff discharged within hours of EEOC fact finding conference, strong inference drawn of retaliatory termination). The plaintiff herein was fired more than three months *after* her expression of concern about Jolly's attention and, more importantly, almost four months after she had been warned to "clean up her act." Even if a causal connection could be drawn between the plaintiff's "protest" of Jolly's conduct and her termination,[16] the defendant has

---

**16.** Noting that establishing a prima facie case is a burden easily carried, *Wrenn v. Gould,* 808

F.2d at 500, the employer's articulation of its

asserted numerous legitimate, nonretaliatory justifications for terminating the plaintiff's employment at Fleetguard. As set forth fully *supra,* the plaintiff's job performance declined throughout 1984. Without reiterating the factual findings regarding the plaintiff's inferior work habits and job performance, suffice it to say that she has not carried the ultimate burden of showing that the defendants' articulated reasons for discharge were specious or pretextual. The court is cognizant of the unfortunate fact that the "good ole boy" network is alive and well today in a number of male-dominated entities and professions. However, the court is unconvinced that the plaintiff was dealing with an anti-female Neanderthal-type management team at Fleetguard. She was fired for not doing her job, pure and simple.

An order shall be entered awarding judgment for the defendants and dismissing the case.

reasons for terminating the plaintiff shall be     examined.