Susan WALTMAN, Plaintiff–Appellant,

v.

INTERNATIONAL PAPER CO.,
Defendant–Appellee.

No. 88–4088.

United States Court of Appeals,
Fifth Circuit.

June 16, 1989.

Laurie W. Lyons, Henry C. Walker, Walker, Tooke, Perlman, Lyons & Clawson, Shreveport, La., for plaintiff-appellant.

Peggy R. Mastroianni, E.E.O.C., Washington, D.C., for amicus curiae-E.E.O.C.

A. Richard Gear, Cook, Yancey, King & Galloway, Shreveport, La., for defendant-appellee.

Before THORNBERRY, KING and JONES, Circuit Judges.

THORNBERRY, Circuit Judge:

Waltman, plaintiff-appellant, brought suit against her employer, International Paper Company (IPCO), defendant-appellee, alleging (1) claims for sexual harassment and sexual discrimination under Title VII and the Louisiana Fair Employment Act (LFEA); and (2) tort claims under Louisiana state law for invasion of privacy, assault, battery and intentional infliction of mental distress. The district court granted a partial summary judgment in IPCO's favor on the grounds that (1) the acts of sexual harassment that occurred more than 180 days before Waltman filed her EEOC claim were time-barred under Title VII because they did not constitute a continuing violation; (2) the acts of sexual harassment brought under state law that occurred before January 15, 1985 were time-barred because they did not constitute a continuing violation; (3) all the claims under Title VII and the LFEA were invalid because IPCO did not know and should not have known of the alleged sexual harassment and because IPCO took prompt remedial action upon learning of the harassment; and (4) Waltman did not state a valid claim for discriminatory failure to promote because she failed to demonstrate that IPCO's promotion decision was motivated by a discriminatory intent.

I. Facts.

Waltman began working at IPCO in April 1982. She worked in the powerhouse of the mill on the "B" shift. The first instance of sexual harassment occurred in the Spring of 1982 when an IPCO employee several times broadcast obscenities directed toward Waltman over the public address system. In response, other employees be-

gan making suggestive comments to Waltman. Waltman complained to her supervisor who said he would "take care of it." A foreman told the employee who had broadcast the obscenities to stop. The employee was not punished and no note regarding the incident was placed in his employment file.

In September of 1982, IPCO moved Waltman to the "A" shift. While on the A shift, Waltman's supervisor, Garrett, and his assistant urged Waltman to have sex with a co-worker. On several occasions, Garrett touched Waltman in an offensive manner—pinched her buttocks with pliers and tried to put his hands in her back pockets. In addition, Garrett and fellow employees often made sexually suggestive comments to Waltman, for example "I would like a piece of that," referring to Waltman.

During her tenure on the A shift, Waltman received over thirty pornographic notes in her locker. Sexually explicit pictures and graffiti were drawn on the walls of the powerhouse, on the restroom walls and in the elevator.[1] Some of these drawings were directed at Waltman.[2] Employees had sexually oriented calendars on the walls and in their lockers which were kept open. They also hung used tampons from their lockers. On more than one occasion, co-workers propositioned Waltman.

In October of 1983, Waltman reported the incidents recited above to Pardue, one of the IPCO managers. Pardue allegedly told her she should expect this type of behavior working with men. Pardue claims he spoke with Waltman's supervisor, Garrett, who was one of the men who had been harassing Waltman, about Waltman's complaints and told Garrett to inform his shift that this behavior was not acceptable. Garrett stated that Pardue never told him that Waltman had accused him of inappropriate touching and sexual comments. Garrett also could not recall Pardue ever instructing him to tell his crew to stop the harassment. Pardue did not discipline anyone nor did he investigate Waltman's claims. Rather, Pardue transferred Waltman to another shift.

During the summer of 1984, an IPCO employee told a truck driver that Waltman was a whore and that she would get hurt if she did not keep her mouth shut. Later, in the Fall of 1984, several other incidents occurred. A Brown and Root employee, who was working at the mill, grabbed Waltman's arms while she was carrying a vial of hot liquid; another Brown and Root worker then stuck his tongue in her ear. In a separate incident, an IPCO employee told Waltman he would cut off her breast and shove it down her throat. The same employee later dangled Waltman over a stairwell, more than thirty feet from the floor. In November 1984, one employee pinched Waltman's breasts. In another incident, a co-worker grabbed Waltman's thigh.

In addition to the specific incidents recited above, Waltman's fellow workers constantly directed lewd and suggestive comments toward her. Waltman estimated that eighty percent of the men in the powerhouse made sexually suggestive comments to her at some point. She also testified that a week did not go by without a co-worker directing a sexual comment at her.

1. Waltman testified that in the bathroom there were "very, very explicit drawings of women with their legs spread out and this type of thing" and that there were "pornographic pictures" in many of the lockers, which the men would leave open. Garrett testified that there were drawings of naked men and women on the walls.

2. Waltman testified in her deposition that the words "Sue is a whore" were scratched in the paint on the elevator in eight inch letters and that "[t]hey wrote these things several times in the bathroom [and] on the elevators." Waltman testified that when the graffiti could be washed off, she would do it herself, but that she could not remove the graffiti that was scratched into the paint.

Waltman further testified that "[t]he things that were written on the walls were the same types as things that were put on the notes in lockers, in my locker, such as Sue sucks everybody's dick, Sue is a whore, I am going to eat Sue's pussy or Sue has a nice pussy, this type of thing, the same language that was in the elevator."

In November of 1984, Waltman became ill, allegedly as a result of the sexual harassment. She took a sick leave from November 18, 1984 until February 8, 1985. Waltman was hospitalized for a few days for depression. She began seeing a psychiatrist in the middle of December.

At the beginning of January 1985, Waltman contacted Holt, her supervisor, and told him of all the incidents of sexual harassment she had experienced at the mill. Holt spoke with his superiors, who met several times to discuss Waltman's allegations. Senior managers also met with Garrett, who, according to one manager, denied Waltman's allegations concerning him. In separate testimony, Garrett stated that none of his superiors ever told him that he had done anything wrong. IPCO did not reprimand Garrett or any of the other people who had harassed Waltman, nor did IPCO further investigate any of Waltman's claims.

On January 14, 1985, Waltman met with senior plant managers. Waltman told them of the various harassing incidents. On January 18, 1985, the plant manager sent Waltman a letter saying that IPCO could not investigate her claims without identifying her. The letter also stated that IPCO would not begin the investigation until Waltman authorized it. On January 21, 1985, Waltman met with IPCO's human resources manager and the mill's personnel manager. At this meeting, the managers told Waltman it would be detrimental to her if they pursued an investigation of the IPCO workers Waltman had charged with harassment. Waltman stated that the managers also intimated that if Waltman pursued an investigation it would hurt her chances of a promotion and make it impossible for her to work at the mill.

On January 24, 1985, the plant manager drafted a letter to Waltman, stating that IPCO would investigate the incident involving the Brown and Root employees. The letter also stated that, pursuant to Waltman's wishes, IPCO would not investigate the incidents involving IPCO employees. The final sentence of the letter read: "We will respect your wishes and would appreci-

ate your confirming this by signing the attached copy of this letter." Waltman signed the letter. Waltman alleges that when she signed the letter she understood that there would be an investigation of the IPCO workers, but that the investigation would be confidential and informal without any mention of her name. IPCO contends that Waltman wanted no investigation into the incidents involving the IPCO employees.

IPCO did not conduct an independent, internal investigation of the incidents Waltman alleged nor did IPCO take any concerted steps to remove or prohibit the pornographic graffiti around the mill. On occasion, they would wash the walls, but the graffiti persisted. In fact, the only step IPCO took to address the sexual harassment at the mill was to require that all the supervisors read the plant policy on sexual harassment out loud at a shift meeting.

IPCO took no disciplinary action against any of its employees. IPCO did contact Brown and Root about the incident involving the Brown and Root workers; Brown and Root placed warning letters in the employees' files.

It is noteworthy that throughout this period of harassment, Waltman never invoked the established grievance procedures at the plant.

On February 4, 1985, Waltman's doctor released her to return to work on February 8, 1985. During her first week back at work, Waltman observed that the sexual graffiti was still all over the walls. She also overheard sexual remarks about another woman. On February 13, 1985, there was a shift meeting, at which time the supervisor read out loud IPCO's policy on sexual harassment. Several employees responded to the policy statement with laughter and comments that women provoke sexual harassment by wearing tight jeans. At the meeting, Waltman announced her resignation. A few days after the shift meeting, an IPCO employee grabbed Waltman's breasts and directed a high pressure hose at her crotch.

Waltman submitted her official resignation on February 16, 1985. Her last day

was ten days later. Waltman's effective termination date was March 14, 1985.

In addition to her claims of sexual harassment, Waltman alleges she was discriminatorily denied a promotion because she did not respond to co-workers sexual advances. Waltman was twice denied a promotion to operator. Waltman alleges that the people who were promoted before her were less qualified and that one person was promoted because she tolerated and, perhaps even encouraged, her fellow workers' sexual behavior.

On April 25, 1985, Waltman filed charges with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a notice of the right to sue on December 31, 1985 and Waltman filed this suit on January 16, 1986. Waltman sought damages for (1) sexual harassment and discriminatory failure to promote under Title VII and the LFEA; and (2) invasion of privacy, assault, battery and intentional infliction of mental distress under state law.

IPCO filed a motion for summary judgment, which the district court partially granted on the grounds that: (1) all incidents prior to October 1984 were time-barred under Title VII because they did not constitute a continuing violation; (2) all incidents occurring before January 15, 1985 were time-barred under state law because they did not constitute a continuing violation; (3) Waltman could not sustain an action for sexual harassment under Title VII or the LFEA because IPCO did not know and should not have known of the alleged harassment and that when IPCO learned of the harassment, it took prompt remedial action; and (4) the first discriminatory failure to promote claim was untimely and the second claim was not substantiated by evidence that IPCO's failure to promote Waltman was based on a discriminatory intent. The court denied IPCO's motion for summary judgment on Waltman's claims of invasion of privacy, assault, battery and intentional infliction of mental distress based on the acts of the employee who grabbed Waltman's breasts and directed the air hose at her crotch in February 1985.

Waltman appealed the grant of partial summary judgment to IPCO. The EEOC also filed an amicus curiae brief urging reversal of the district court's decision.

**II. Reliance on evidence not properly in the record.**

As a preliminary matter, the parties dispute whether the district court erred in refusing to consider evidence that Waltman submitted with her motion for reconsideration of the court's summary judgment. In their briefs, both the EEOC and Waltman relied on the evidence attached to Waltman's motion for reconsideration. There is a similar dispute regarding deposition evidence upon which IPCO relied in its motion in opposition to Waltman's motion to reconsider and in its brief before this court.

IPCO filed its motion for summary judgment on September 5, 1987. After Waltman requested and the court granted two extensions, Waltman filed her response to IPCO's motion on October 8, 1987. On October 30, 1987, the district court granted a partial summary judgment in favor of IPCO. On November 9, 1987, Waltman filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). Waltman attached various documents to her motion, including excerpts from depositions, her own affidavit, and several internal IPCO memoranda. Neither party had previously brought this evidence before the district court.

Federal Rule of Civil Procedure 59(e) allows motions to alter or amend judgment filed within ten days of entry of the judgment. Such motions serve the narrow purpose of allowing a party "to correct manifest errors of law or fact or to present newly discovered evidence." *Keene Corp. v. International Fidelity Insurance Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *affd.* 735 F.2d 1367 (7th Cir.1984).

Waltman urges that the material attached to her motion for reconsideration was necessary "to respond to the judge's ruling which, in essence, discounted plaintiff's testimony ... [N]o new factual issues were submitted." This statement does not indicate that Waltman sought to correct a

manifest error of law or fact or to introduce newly discovered evidence. In fact, except for one deposition, all of the material attached to Waltman's motion for reconsideration was available to Waltman at the time she filed her motion in opposition to summary judgment. Because these materials were available to Waltman when she opposed IPCO's summary judgment motion and because she did not give any explanation why she did not include the materials with her motion in opposition to summary judgment, we hold that her submission of these materials with her motion for reconsideration was untimely. For the same reasons, we also hold that IPCO's dependence on deposition testimony that it did not submit to the district court during the pendency of the motion for summary judgment was improper. *See Harsco Corp. v. Zlotnicki,* 779 F.2d 906 (3rd Cir.1985), *cert. denied* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); *Mas Marques v. Digital Equipment Corp.,* 637 F.2d 24 (1st Cir.1980).

Waltman's motion for reconsideration did include one deposition that was not completed until October 10, 1987, two days after Waltman filed her motion opposing summary judgment. Although Waltman could not have accurately relied on this deposition when she filed her motion opposing summary judgment, she could have presented this evidence to the court before her motion for reconsideration. Waltman could have filed a motion for a continuance under Federal Rule of Civil Procedure 56(f) to allow her time to depose the remaining witness and prepare the evidence for the court. In addition, she could have asked the court for permission to supplement her motion in opposition to summary judgment when the deposition became available. Because Waltman failed to take the proper steps to insure consideration of this deposition, we decline to allow her to slip it into the record through the motion for reconsideration. *See Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828 (10th Cir.1986). To the extent that IPCO, Waltman and the EEOC relied on evidence not properly in the record, we have declined to

consider the evidence and have not relied upon it in deciding this case.

### III. Standard of Review.

In reviewing the district court's grant of summary judgment, this court applies the same standard of review as the district court. *Ayo v. Johns–Manville Sales Corp.,* 771 F.2d 902, 904 (5th Cir.1985). The pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, must demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id. See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986), *cert. denied* —— U.S. ——, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988); Fed.R.Civ.P. 56(c). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mutual Automobile Insurance Co.,* 784 F.2d 577, 578 (5th Cir.1986).

### IV. Continuous Violation—Federal Claim of Sexual Harassment.

In order to sustain a Title VII claim of sexual harassment, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e–5(d). The limitations period commences on the date that the discriminatory act occurred. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Waltman filed her charge of discrimination with the EEOC on April 24, 1985, almost three years after the first incident of harassment. Although these facts suggest that Waltman cannot sustain her claims based upon incidents that occurred more than 180 days before April 25, 1985, this circuit has recognized an equitable exception to the 180 day limitation on the actionable period. This equitable exception arises "[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Abrams v. Baylor College of Medicine,* 805 F.2d 528, 532 (5th Cir. 1986). In order to sustain a claim under this exception, known as a continuing viola-

tion, the plaintiff must show that at least one incident of harassment occurred within the 180 day period. *Id.* at 533. In *Berry v. Board of Supervisors of Louisiana State University,* 715 F.2d 971 (5th Cir.1983), *cert. denied* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986), this court discussed factors to consider in determining whether a plaintiff can support a claim for a continuing violation:

> This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* at 981 (emphasis added).

A. *Subject Matter.*

Waltman's claim undisputedly meets the first *Berry* element that the alleged acts involve the same subject matter; every incident reported by Waltman involves sexual harassment.

B. *Frequency.*

IPCO asserts that Waltman has not produced sufficient facts to raise an issue regarding the second *Berry* factor: the incidents of sexual harassment must be recurring and not isolated. IPCO urges that (1) there was no evidence to demonstrate that the people harassing Waltman were acting in concert; (2) there was not a management level policy encouraging such behavior; (3) it was not the same person harassing Walt-man and some people only harassed her on one occasion; and (4) too much time elapsed between the specific incidents of harassment.

1. Conspiracy.

■ IPCO's first argument is not relevant to Waltman's continuing violation claim. This court has never suggested that a plaintiff bringing a claim of sexual harassment must show a conspiracy among the harassers to prove a continuous violation.

2. Company policy.

■ IPCO's claim that Waltman failed to show that there was a company policy permitting sexual harassment is likewise irrelevant. A plaintiff does not have to prove that the defendant had a policy of discrimination to support a claim based on a continuing violation. A plaintiff can prove a continuing violation either by producing evidence of a series of discriminatory acts or by demonstrating that the defendant has a policy of discriminating. *See Bruno v. Western Electric Co.,* 829 F.2d 957, 961 (10th Cir.1987).

3. Incidents involved different people.

■ The fact that not all the incidents of harassment involved the same people does not show a lack of recurrence or frequency. The *Berry* court discussed recurrent acts of discrimination, not recurrent actors. The focus is whether Waltman was subjected to recurring acts of discrimination, not whether a given individual harassed Waltman recurrently. *See Broderick v. Ruder,* 685 F.Supp. 1269, 1271–72 (D.D.C.1988) (the district court ruled in favor of a plaintiff who was subject to sexual harassment over a six-year period of time, involving several different people, some of whom approached her on only one occasion).

4. Time elapsed.

■ IPCO finally asserts that too much time elapsed between the specific incidents of harassment to support a finding of a continuing violation. The fact that there

were gaps between the specific incidents to which Waltman testified does not demonstrate a lack of continuity. In *Abrams*, 805 F.2d 528, this court found a continuing violation where Jewish doctors were excluded on numerous occasions over several years from participation in an overseas medical services program through Baylor Medical School. Similarly, other courts, including the Supreme Court have heard sexual harassment claims involving separate incidents spanning many years without even mentioning the timeliness issue. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (plaintiff's claim for sexual harassment encompassed incidents over a four year period); *Broderick v. Ruder*, 685 F.Supp. 1269 (plaintiff's claim was based on incidents spanning six years).

■ It is noteworthy that since this court's decision in *Berry*, the Supreme Court decided *Meritor Savings Bank*, which established that a plaintiff can bring a claim for sexual harassment based on acts that created a "hostile environment." The *Meritor Savings Bank* decision is relevant to the continuing violation theory because a hostile environment claim usually involves a continuing violation. In a hostile environment, an individual feels constantly threatened even in the absence of constant harassment. Thus, in looking at the frequency of harassment, the focus should not be a mechanical calculation. Rather, in light of *Meritor Savings Bank*, the court should review the pattern and frequency of the harassment and determine whether a reasonable person would feel that the environment was hostile throughout the period that formed the basis of the plaintiff's claim. Waltman's evidence of individual incidents of harassment coupled with the evidence of sexual graffiti throughout the powerhouse could support a finding that the acts of harassment were sufficiently recurrent to create a continuously hostile environment.

### C. *Permanence.*

■ In discussing the permanence factor, the *Berry* court instructed courts to look at (1) whether the permanence of the act "should trigger an employee's awareness and duty to assert her rights;" and (2) whether the consequences of the act would continue absent an intent to discriminate. 715 F.2d at 981. Acts of harassment that create an offensive or hostile environment generally do not have the same degree of permanence as, for example, the loss of promotion. If the person harassing a plaintiff leaves his job, the harassment ends; the harassment is dependent on a continuing intent to harass. In contrast, when a person who denies a plaintiff a promotion leaves, the plaintiff is still without a promotion even though there is no longer any intent to discriminate. In this latter example, there is an element of permanence to the discriminatory action, which should, in most cases, alert a plaintiff that her rights have been violated. We find that in the instant case, there is a material issue whether the acts of sexual harassment, had the *Berry* quality of "permanence" that would alert Waltman that her rights had been violated.

Because Waltman has alleged sufficient facts to demonstrate that there exists a genuine issue of material fact regarding the existence of a continuing violation, summary judgment on this issue was improper.

### V. Continuous Violation—State Claim of Sexual Harassment.

Under the Louisiana Civil Code, plaintiffs must file their claims within one year from the date of the injury or damage. La.Civ. Code Ann. art. 3492 (West Supp.1988). The Louisiana Supreme Court has recognized an equitable exception to this prescription period, holding that "when the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated.... Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from the cessation of the wrongful conduct causing the damage." *South Central Bell Telephone v. Texaco, Inc.*, 418 So.2d 531, 533 (La. 1982); *see also R.J. Reynolds Tobacco*

*Company v. Hudson,* 314 F.2d 776 (5th Cir.1963). For the same reasons recited above, we hold that Waltman has introduced sufficient evidence to raise an issue under state law whether IPCO engaged in a continuing violation.

VI. Prima Facie Case of Sexual Harassment.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000(e)–2(a)(1). This circuit has established five elements necessary to state a prima facie case of sexual harassment:

(1) [t]he employee belongs to a protected group ...;

(2) [t]he employee was subject to unwelcome sexual harassment, i.e. sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or uncited and is undesirable or offensive to the employee;

(3) [t]he harassment complained of was based upon sex ...;

(4) [t]he harassment complained of affected a "term, condition or privilege of employment," i.e., the sexual harassment must be sufficiently severe as to alter the conditions of employment and create an abusive working environment;

(5) [r]espondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Jones v. Flagship International,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987), quoting from *Henson v. City of*

*Dundee,* 682 F.2d 897 (11th Cir.1982); *see also Meritor Savings Bank,* 477 U.S. at 66–67, 106 S.Ct. at 2405–06 (established that a plaintiff can bring a sexual harassment claim based on quid pro quo harassment or a hostile environment).

The district court granted summary judgment for IPCO on the grounds that Waltman did not produce sufficient evidence of (1) the existence of a hostile environment; (2) IPCO's knowledge of the harassment; and (3) IPCO's failure to adequately remedy the situation.

■ Although Waltman must state a prima facie case of sexual harassment to shift the burden onto IPCO at trial, she need not prove a prima facie case to succeed in this appeal. Rather, she must provide evidence that raises a genuine issue of material fact concerning each element of her prima facie case. *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 640–41 (5th Cir.1985).

A. *Existence of a hostile environment.*

■ A hostile environment claim arises when a plaintiff alleges harassment "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2406. Waltman introduced evidence that several different employees touched her in a sexual manner and directed sexual comments toward her. In addition, there was evidence of ongoing sexual graffiti on the walls, and in the elevator and bathroom of the mill. Although not all the graffiti was directed at Waltman, it is all relevant to her claim.[3] As the D.C. Circuit held in *Vinson v. Taylor,* 753 F.2d 141, 146 (D.C.Cir.1985), *affd.* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986),

---

**3.** Although the dissent suggests that graffiti which includes male references may not constitute discrimination on the basis of sex because it does not differentiate between men and women, this court has previously rejected this argument. *Bennett v. Corroon & Black Corp.,* 845 F.2d 104, 106 (5th Cir.1988). Most sexual graffiti will include both male and female "references." In *Bennett,* the cartoons at issue depicted both men and women and the district court

held that "while sexually oriented and offensive, they were not based on the sex of the plaintiff." On appeal, this court reversed the district court, holding that "any reasonable person would have to regard these cartoons as highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse." *Id.*

"[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."

In *Henson*, 682 F.2d at 899, the Eleventh Circuit found that the plaintiff had established a prima facie case of a hostile environment where the employer had subjected the plaintiff "to numerous harangues of demeaning sexual inquiries and vulgarities ... and repeatedly requested that she have sexual relations with him." Waltman, who arguably suffered more harassment than the plaintiff in *Henson*, does not have to make a prima facie case. She need only prove that there is a factual dispute concerning the existence of a hostile environment. *See Barbetta v. Chemlawn Services Corp.*, 669 F.Supp. 569, 572–73 (W.D.N.Y.1987) (denying the defendant's motion for summary judgment where plaintiff introduced "evidence of pornography in the workplace picturing nude or partially naked women, vulgar comments by employees and supervisors, the requirement that female employees wear skirts or dresses on certain occasions because a visiting supervisor liked to look at legs, and unwanted physical contact of a sexual nature by a male employee"); *Hayden v. Atlanta Newspapers*, 534 F.Supp. 1166 (N.D.Ga. 1982) (denying a motion for summary judgment where plaintiff produced evidence that on two separate occasions, employees bumped into her in a sexual manner).

Viewing the specific incidents of harassment and the ongoing sexual graffiti at IPCO in light of existing case law, we hold that Waltman has raised an issue regarding the existence of a hostile environment at IPCO.

### B. *IPCO's Knowledge of the Harassment.*

There is some uncertainty in the law concerning the type and extent of notice to the employer necessary to sustain a sexual harassment claim under Title VII. In *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408, the Supreme Court held that an employer is not automatically liable for sexual harassment by supervisors, but that "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.* at 72, 106 S.Ct. at 2408. The Court also held that "the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure [does not] insulate [the defendant] from liability." *Id.* at 72, 106 S.Ct. at 2408–09. We need not resolve the uncertainty in the law at this time because Waltman has proved sufficient facts to demonstrate that there is an issue as to whether IPCO had constructive or actual knowledge.

Waltman can show actual notice by proving that she complained to higher management. Waltman reported the incidents of harassment to higher management on three occasions. First, Waltman reported the lewd comments on the public address system to her supervisor shortly after the incident occurred. Second, Waltman reported the 1983 incidents to Pardue, one of the managers, in October 1983. Third, she reported all of the harassment to Holt, her supervisor, and other managers, in January 1985.

Waltman can demonstrate constructive notice by "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Henson*, 682 F.2d at 905, citing *Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir.1981); *Swentek v. U.S. Air, Inc.*, 830 F.2d 552, 558 (4th Cir.1987). Waltman's testimony, *supra*, note 2, that there was sexual graffitti directed at her in numerous locations indicates there is a factual issue whether the harassment was pervasive. Waltman has, thus, adduced sufficient summary judgment evidence to raise a fact issue, under a theory of either actual or constructive notice, regarding IPCO's knowledge of the alleged harassment. Summary judgment on this point was therefore inappropriate.

### C. *IPCO's Failure to Adequately Remedy the Situation.*

Under *Jones*, 793 F.2d at 719–20, in order to establish a prima facie case,

a plaintiff must demonstrate that the employer failed to take prompt remedial action in response to the sexual harassment. In reviewing the record in this case to determine if Waltman alleged sufficient facts to raise a genuine issue regarding the adequacy of IPCO's response to her claims, we are guided by *Bundy v. Jackson*, 641 F.2d 934, 947 (D.C.Cir.1981), where the court held that "[an employer] should promptly take all necessary steps to investigate and correct any harassment, including warnings and appropriate discipline directed at the offending party, and should generally develop other means of preventing harassment within the agency." Consistent with *Bundy*, we have held that an employer must take prompt and appropriate remedial action, "reasonably calculated" to end the harassment. *Jones*, 793 F.2d at 719–20. What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. *See DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n. 5 (1st Cir.1980) (concluding that "more than mere verbal chastisements of those employees who used racial epithets was needed in order for [the defendant] forcefully to convey the message that racism would not be tolerated"). *See also Garziano v. E.I. Dupont De Nemours & Co.*, 818 F.2d 380, 388 (5th Cir.1987) (noting that "employers have an affirmative duty to eradicate 'hostile or offensive' work environments"); *Tomkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044, 1048–9 (3rd Cir.1977) (holding that "Title VII is violated ... [if] the employer does not take prompt and appropriate remedial action after acquiring ... knowledge [of the harassment]"). These cases indicate that not every response by an employer will be sufficient to discharge its legal duty. Rather,

the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not "reasonably calculated" to halt the harassment.

**1. 1982 report of comments over public address system.**

Waltman told her supervisor of the sexual comments made toward her on the public address system. The foreman supervising the employee who made the comments told the employee to stop making the comments. IPCO did not reprimand the employee, nor did the company make a note of the incident in the employee's file. The evidence indicates there is a factual issue whether IPCO should have taken further measures to end the harassment. *See DeGrace*, 614 F.2d at 805 n. 5 (1st Cir. 1980).

**2. 1983 report to Pardue of several harassing incidents.**

Waltman reported numerous acts of harassment to Pardue, an IPCO manager, in October 1983. Pardue told her she should expect such behavior because she was working with men. He also stated that there was no way of determining who was writing the graffiti.

Pardue alleges he discussed Waltman's complaints with Garrett, her supervisor and one of the men who had harassed Waltman. Garrett does not recall this conversation. Other than this alleged discussion with Garrett, Pardue did not investigate any of the incidents Waltman reported nor did he discuss Waltman's claims with any of the employees she accused of harassing her. Pardue did not discipline anyone. Instead, he transferred Waltman to another shift.[4]

---

**4.** Addressing only the factual issue, and not the legal significance of a plaintiff's requests, we note that the dissent relies heavily on an argument not raised by IPCO—that Waltman requested a transfer to a different shift in 1983. We note that according to the record, Dempsey Pardue could not recall whether he discussed the transfer with Waltman in advance and that Waltman's own deposition testimony on the subject is conflicting. Waltman testified at one

point that when *advised* of her transfer to D shift, she asked if she could instead be transferred to B shift because she had "never had any problems" when working there previously. Elsewhere, Waltman states that she "insisted" on a transfer to a different shift.

In any event, whatever the factual accuracy of this specific point, it does not dispose of the question whether IPCO's remedial steps were adequate. As we hold above, Waltman has ad-

IPCO had a duty to address the harassment that Waltman alleged. Waltman's evidence that the only action taken by IPCO was to transfer her to another shift raises a question whether IPCO adequately exercised its duty to eradicate the hostile environment.

### 3. 1985 report to Holt regarding all incidents of harassment.

In January 1985, Waltman reported all the incidents of harassment to Holt, her supervisor. Holt responded by contacting management personnel, who met with Waltman to discuss her allegations. These managers also met with Garrett. According to one manager, Garrett denied Waltman's charges. Garrett said none of the managers ever told him he had done anything wrong. The IPCO managers did not investigate Waltman's accusations concerning Garrett nor did they investigate any of the other incidents of harassment.

The IPCO plant manager did write Waltman stating that they could not investigate her claims without revealing her identity. Two managers also allegedly informed Waltman that an investigation would be detrimental to her. This evidence suggests that IPCO attempted to dissuade her from seeking an investigation.

In late January, the plant manager drafted a letter to Waltman stating that IPCO understood that Waltman wanted an investigation of the Brown & Root employees, but did not want any inquiries regarding the incidents involving IPCO employees. In the letter, the plant manager asked Waltman to sign the bottom of the page to confirm that she agreed with the contents of the letter. Waltman signed the letter. IPCO alleges that when Waltman signed the letter, she indicated that she did not want an investigation and waived her claim that IPCO failed to remedy the situation. Waltman testified that IPCO management told her they would conduct an informal, confidential investigation of the incidents involving IPCO employees and that the let-

ter merely indicated that she did not want a formal investigation. This testimony indicates there is a dispute whether Waltman discharged IPCO from its duties to respond to her claims of harassment. The effectiveness of the letter as a waiver is further called into question by Waltman's suggestion that IPCO actively discouraged her from pursuing an investigation.

Summary judgment on the ground that IPCO responded precisely as Waltman requested and acted out of benevolent concern for her emotional well-being would be inappropriate given that Waltman disputes each of these factual propositions, and has adduced sufficient evidence to indicate that she might be able to establish her version of the facts at trial.

### 4. Graffiti.

IPCO had a duty to address the sexual graffiti that was throughout the mill, particularly the graffiti that was directed at Waltman. IPCO failed to demonstrate that the company tried to determine who was writing the graffiti. In addition, the fact that IPCO occasionally washed the walls of the plant is not sufficient summary judgment proof that the company attempted to remove and prohibit the graffiti that served to harass Waltman. In a recent decision of this court, we held that an employer failed to take prompt and adequate action when he waited one day to remove offensive cartoons depicting the plaintiff from the men's bathroom. *Bennett*, 845 F.2d 104. In light of *Bennett* we hold that IPCO's failure to remove and prohibit the graffiti raises an issue regarding the adequacy of its remedial measures.

■■■ The fact that IPCO had all the supervisors read the IPCO policy against sexual harassment to their crews does not alter our finding that there is a genuine issue of material fact regarding the adequacy of IPCO's remedial measures. Under the standard outlined above, IPCO had a duty to take steps reasonably calculated to halt the harassment. Although a court

duced sufficient summary judgment evidence to raise a fact issue regarding the adequacy of

IPCO's response to the sexual harassment.

may find after a full trial that reading the policy against sexual harassment to the employees was sufficient remedial action, we believe there is some question whether IPCO's actions meet the requirements set forth above and, therefore, hold that IPCO cannot sustain a summary judgment on the grounds that the supervisors read the sexual harassment policy to their crews. Similarly, we hold that the fact that Waltman did not follow IPCO's sexual harassment grievance procedure does not alone support summary judgment. *See Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408-9.

## VII. Discriminatory Failure to Promote.

We recognize that in light of *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) the elements of proof in a sex discrimination claim will vary depending on whether the evidence leads to a discrimination claim based on "mixed motives" or "pretext."[5] In a mixed motive case, an employer may have legitimate *and* discriminatory reasons for taking action injurious to a plaintiff. In a pretext case, an employer has either a discriminatory *or* a non-discriminatory rationale for its actions. The elements the parties must prove depend upon the classification of the claim as a mixed motive case or a pretext case.

In a mixed motive case, "[o]nce a plaintiff ... shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving [by a preponderance of the evidence] that it would have made the same decision even if it had not allowed gender to play such a role." *Id.* at ——, 109 S.Ct. at 1787. In a pretext case, a plaintiff must show "that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The defendant then bears the burden of proving a "legitimate reason for the action." *Id.* 101 S.Ct. at 1095. The ultimate burden of persuasion in a pretext case rests with the plaintiff to persuade "the court that she has been the victim of intentional discrimination." *Id.*

### A. The Standard of Proof.

One circuit has held that the standard of proof should be reduced for plaintiffs who bring sex discrimination claims after prevailing on a claim of sexual harassment. The D.C. Circuit has held that where a plaintiff has already proven illegal discrimination based on sexual harassment, and is making a claim for discriminatory failure to promote, she need only prove "(1) that she was a victim of a pattern or practice of sexual harassment attributable to her employer; and (2) that she applied for and was denied a promotion for which she was technically eligible and of which she had a reasonable expectation. *Bundy*, 641 F.2d at 953. The *Bundy* formulation does not require that the plaintiff prove the defendant intended to discriminate against her in failing to promote her if she has already successfully proven this intent in the context of her sexual harassment claim. *Id.* at 952-53. Although the *Bundy* decision preceded the Supreme Court's decisions in *Burdine* and *Hopkins*, the D.C. Circuit has not retreated from its *Bundy* holding. *See Johnson v. Brock*, 810 F.2d 219 (D.C.Cir. 1987).

We part company with the D.C. Circuit on this issue and hold that Waltman must satisfy the *Burdine* and *Hopkins* elements to sustain her claim for discriminatory failure to promote even if she prevails on her sexual harassment claim. *See Henson*, 682 F.2d at 906-07 (Eleventh Circuit rejecting the *Bundy* analysis). Waltman's claim of sexual discrimination is distinct from her claim for wrongful failure to promote. Each claim has its own elements each of which must be proven independently. A finding that IPCO discriminated

---

**5.** It is not essential that Waltman distinguish the nature of her claim at this point in the proceedings. —— U.S. at —— - ——, n. 12, 109 S.Ct. at 1789, n. 12, (noting that "[a]t some point in the proceedings, of course, the district court must decide whether a particular case involves mixed motives").

against Waltman when employees sexually harassed her does not lead to the conclusion that IPCO discriminated against Waltman in failing to promote her.

## B. Prima Facie Case of Discriminatory Failure to Promote.

■ Waltman asserts that she was twice passed over for promotions that were ultimately given to other less-qualified employees. IPCO first promoted a co-worker over Waltman in August 1984. Waltman's claim regarding this promotion is time-barred because it occurred more than 180 days before the date Waltman filed her charge with the EEOC. *See Berry*, 715 F.2d at 971.

■ The second time IPCO promoted a co-worker over Waltman was in February 1985. Waltman asserts that she was denied a promotion because she refused to respond to co-workers' sexual advances and propositions. In reviewing Waltman's evidence, we must heed this court's warning that summary judgments are particularly questionable in cases of employment discrimination. In *Thornbrough*, 760 F.2d at 640–41, we held that:

> [i]n general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent ... Often motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder.

Waltman presented evidence that she had all the necessary qualifications for the February 1985 promotion and had been "certified" on all the required tasks in less than half the time it took the person IPCO promoted ahead of her. In addition, except for her period of medical leave, Waltman had a good attendance record and was considered a good worker.

Waltman has produced two pieces of evidence to support her claim that IPCO intended to discriminate against her. First, co-workers play an important role in deciding who will be promoted. Waltman testified that some of the workers who had harassed her participated in the decision not to promote her. This fact alone raises an inference of intent to discriminate. Second, the criteria IPCO used to make promotion decisions was highly subjective, which, as this court has held in previous cases, makes it easier to discriminate. *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 192 (5th Cir.1983). The evidence that co-workers who had harassed Waltman participated in the decision whether to promote her and the evidence that the promotion criteria were subjective is sufficient to defeat a summary judgment on this issue. *See Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988) (although the plaintiff's evidence was "barely sufficient to create a jury issue of intentional age discrimination," the court reversed the district court's summary judgment.) Based on the evidence before us, we find that Waltman has raised an issue of material fact concerning IPCO's motivation behind denying her promotion under the standards established by both *Burdine* and *Hopkins*.

For the foregoing reasons, we REVERSE the district court and REMAND for a full trial on the merits.

EDITH H. JONES, Circuit Judge, dissenting:

EEOC Vice Chairman Ricky Silberman described the agency's recently revised guidelines against sex harassment as "a logical extension of [*Meritor Savings Bank v.] Vinson*[1] that will be used to maximize protection against sexual harassment." She further observed, "*sex harassment is about power and supervisors who use it are violating Title VII.*" (emphasis added) BNA Labor Reporter Current Developments (Oct. 18, 1988).

Power cannot be exerted over employees unknowingly. "Harassment" and "power" are active nouns that embody an exercise of will. The principal question in this case

---

1. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986).

is under what circumstances acts of co-workers, not supervisors, of the plaintiff, can render the employer liable for sex harassment and the noxious exercise of power that Title VII forbids. An equally important question is the extent to which sexual graffiti are probative of an employer's knowledge of a hostile sexual environment. Because I disagree that Waltman has established a fact issue on the pivotal issue of employer liability, and because the majority's *dicta* concerning actionable sexual harassment are overbroad, I respectfully dissent.

### 1. A Preface on Sexual Harassment.

Waltman's claim, even viewed in its best light for summary judgment purposes,[2] developed over two and a half years and consists of several isolated incidents of unwanted physical contact, an obscene statement made over the plant public address system, plus several remarks addressed to her. She also complains of sexual graffiti on the plant walls, most of which did not involve her or the female anatomy, and "girlie" pictures hanging in men's lockers, as well as a calendar depicting bikini-clad women displayed on a shop wall. I would not suggest that any of the incidents she describes are inoffensive or that the male workers' choice of graffiti or calendars was tasteful. But a hostile environment cause of action is comprised of more than one alleged offense, and I think several factors counsel against allowing a hostile environment claim to proceed in this case.

First, all but one of the specific incidents involved coworkers or non-employees of IPCO.[3] Only one man was involved in more than one physical incident. The incidents were spaced well apart chronologically. Waltman began work at the plant in April 1982. She complained about supervisor Garrett's behavior in October 1983 and, at her request, was immediately re-assigned to another shift. She admitted that 13 months elapsed until any other physical incident occurred. There is no pattern, conspiracy or consistency to the offensive physical incidents.[4]

Second, when she complained about particular unwelcome conduct, IPCO responded. The obscene comments over the P.A. system ceased as soon as she brought them to a supervisor's attention. Dempsey Pardue placed her on a different shift—at her request—after she took issue with the atmosphere on the "A" shift. The calendars and photographs were removed from the men's lockers. IPCO counselled her at several management levels and tried to resolve her January, 1985, complaints while avoiding undue emotional stress on her. She signed a letter requesting no formal investigation of her coworkers. IPCO, however, with her permission, informed Brown & Root of her charges against its employees. IPCO's resident manager met with all exempt salaried personnel to reiterate the company policy against sex harassment, and at a crewshift meeting attended by Waltman just after she returned to work, the policy was also stressed.

---

**2.** There is evidence in the record conflicting with Waltman's assertions, but we may not consider it at this stage of the case. I assume, for instance, that the "touching" incidents she relates are sexual in nature.

**3.** It is difficult to see how IPCO could under any circumstances be liable for the incident involving Brown & Root employees. Brown & Root reprimanded *its* employees after being informed of the "tonguing" incident.

**4.** *See Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 214 (7th Cir.1986) (coworkers' offensive conduct and comments were "too isolated and lacking the repetitive and debilitating effect necessary to maintain a hostile environment claim"); *Moylan v. Maries County,* 792 F.2d 746, 749–50 (8th Cir.1986) ("a single incident or iso-

lated incidents generally will not be sufficient;" the harassment must be "sustained and nontrivial"); *Downes v. Federal Aviation Admin.,* 775 F.2d 288, 293–94 (D.C.Cir.1985) (not every crude joke or sexually explicit remark is actionable; conduct must be "routine" to "become a 'condition' of anyone's employment"); *Sapp v. City of Warner–Robins,* 655 F.Supp. 1043, 1049 (M.D. Ga.1987); *Freedman v. American Standard,* 41 FEP Cases 471, 476, 1986 WL 7825 (D.N.J.1986) ("an obscene message sent on one occasion, rudeness ..., an accepted refusal of a date do not equate to 'sexual harassment which creates a hostile or offensive environment'"); *Hollis v. Fleetguard, Inc.,* 668 F.Supp. 631 (M.D.Tn.1987); *see also* EEOC Policy Guidance § C(2).

Third, Waltman never complained of unwelcome sexual comments by her coworkers, which she allegedly heard almost weekly. As the majority acknowledge, Waltman never resorted to the company grievance procedure.

Not only do the majority overlook or minimize these circumstances, they go further, stating that graffiti *not directed at Waltman* "is relevant to her claim," as they quote with approval from *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C.Cir.1985), the D.C. Circuit's predecessor decision to *Meritor*: "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."

The Supreme Court's decision in *Meritor* superseded the discussion of the D.C. Circuit on this point. *Meritor* cannot be reconciled with the majority's open-ended and gratuitous extension of an actionable claim to encompass harassment of which the plaintiff was not even a target. The Court adopted in *Meritor* the EEOC's guideline that defines sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a) (1988). Further, the guidelines provide that sexual misconduct constitutes prohibited sexual harassment, whether or not it is linked to an economic *quid pro quo*, where the conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." § 1604.11(a)(3). 477 U.S. at 65, 106 S.Ct. at 2405.

To be sure, the Court's reliance on the "unwelcomeness" of sexual verbal or physical conduct lends a subjective component to the definition.[5] However, sexual harass-

ment is not actionable, the Court cautions, unless it is so *"severe or pervasive"* as *"to alter the conditions of the victim's employment* and *create an abusive working environment."* 477 U.S. at 67, 106 S.Ct. at 2406 (emphasis added). These qualifications, it seems to me, are intended to set an objective floor on allegations of sexual harassment. Such language does not, for instance, suggest that whenever a victim *feels* abused, she has a cause of action under Title VII. This conclusion seems not only logical but necessary. We have so little social consensus in sexual mores nowadays that, short of incidents involving unwanted physical contact, it is impossible generally to categorize unacceptable sexual etiquette.[6] It is likewise impossible to eradicate sexual conduct from the workplace—without unthinkable intrusiveness. *Compare Vinson v. Taylor*, 760 F.2d 1330, 1331 n. 3 (Bork, J., dissenting from the denial of *en banc* rehearing).[7] Thus, the law is properly attuned to severe, pervasive and abusive conduct and results.

This case may present a fact issue concerning whether Waltman suffered so many severe and pervasive insults to her personal integrity as to result in an abusive working environment. Waltman alleges that she required hospitalization as a result of her experiences. It does not raise any question whether a woman who was *not* the target of unwanted physical contact or obscene remarks or graffiti might assert a Title VII claim. To render such a claim actionable, as the majority does, not only contravenes *Meritor* but also creates the unpalatable possibility that a woman might sue her employer for consensual conduct that others undertook among themselves. Surely, such invasions of privacy cannot have been the object of banning sexual harassment in the workplace.

---

5. It could be argued, for instance, that the existence of sexual graffiti or lewd language alone, where unwelcome to a plaintiff's eye or ear, are prohibited by Title VII. Determining such a violation would become intensely subjective. That the EEOC guidelines explicitly exempt incidental uses of offensive language and do not refer to graffiti at all suggest to me that these matters may not be so severe or pervasive as to constitute actionable sexual harassment.

6. The majority suggests, for instance, that Waltman "arguably suffered more harassment than the plaintiff" in *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982), who was repeatedly propositioned by her boss. This comparison is itself highly subjective.

7. The EEOC guidelines recognize this also.

## 2. Employer's Liability.

The majority also stray far afield in finding that fact issues exist in the last element of the *Jones*[8] test: whether IPCO knew or should have known of the harassment and took prompt remedial action.

*Meritor,* most of the federal court cases to date, and the EEOC guidelines[9] assume that actionable sex harassment is perpetrated by supervisors, who exert control over an employee's working conditions. In such cases, the Supreme Court seemed to conclude that under agency principles, an employer is liable for a supervisor's conduct that it knew or should have known about. The Court unequivocally cautioned, however, that "the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors." 477 U.S. at 71, 106 S.Ct. at 2408. The majority's decision in this case virtually imposes strict liability on employers, contrary to *Meritor,* for two reasons: the offensive conduct here was undertaken, with one minor exception, by Waltman's coworkers, not supervisors; and the "knowledge" of the "pervasiveness" of coworkers' actions is *imputed* to IPCO only because of the existence of sexual graffiti in the plant and because management was advised of her complaints on three occasions spaced over two and a half years.

Sexual harassment differs from other types of employee torts for which an employer may become liable because it is never carried out to further the employer's business. *Quid pro quo* harassment, for instance, usually occurs fortuitously and solely for the gratification of the individual who made sexual advances. Thus, in *Meritor,* the Supreme Court recognized that Title VII "surely evinces an intent to place some limits on the acts of employees for which employers ... are to be held responsible." *Id.* Agency principles fulfill this role with regard to supervisors, because of their responsibility for and power over the working environment. Coworkers, by contrast, may influence the working environment, but they have no authority over each other. It stands to reason, then, that coworkers are not "agents" of the employer in the same sense as supervisors if they make unwelcome sexual advances, and employer liability consequently must turn on the employer's knowledge of coworker behavior and its failure to afford prompt remedial action. The availability of a formal grievance procedure to address coworkers' offensive behavior should be counted more strongly in the employer's favor, because, contrary to the situation of a grievance against a supervisor, there is no disincentive to its being used against a coworker. *Compare Meritor,* 477 U.S. at 71–74, 106 S.Ct. at 2408–09 (grievance procedure does not necessarily exonerate employer from liability for supervisor's harassment).

Waltman received prompt remedial action from IPCO every time she complained about an offensive action: the public address system remarks were stopped; she was transferred, *at her request,* from "A" shift to "D" shift, and the "A" shift employees were instructed to remove sexual calendars from their lockers; Brown & Root was asked to investigate its employees; and management followed her request, acknowledged in the January 25 letter, as to how to redress her complaints about her coworkers.

The majority minimize each of these actions, suggesting that the offenders should have been formally reprimanded or disciplined in each case or that, even though Waltman's doctor and her superiors were concerned about her fragile psychological state in January 1985, a complete investigation of the coworkers' actions was required.[10] It is beside the point whether, in

**8.** *Jones v. Flagship International,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

**9.** *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2407–08; *Henson v. City of Dundee,* 682 F.2d at 905; *Jones v. Flagship Internat.,* 793 F.2d at 718–20; *Downes,* 775 F.2d at 294 n. 5; *Scott,* 798 F.2d at 214; *Sapp,* 655 F.Supp. at 1049; *Hollis,* 668 F.Supp. at 636 n. 12; EEOC Policy Guidance § D.

**10.** I assume the majority would not advocate disciplining the coworkers without any prior investigation. If such an investigation had occurred, confidentiality was impossible. Walt-

hindsight, management should have done more each time Waltman complained, because each time they responded exactly as she requested.[11] Each time, management's action appears to have been successful, because Waltman never experienced difficulty with that person again. The majority argue a *non sequitur* in suggesting that a reprimand to the man who remarked about Waltman over the P.A. system in April 1982 would have prevented Garrett from playfully putting his hand in her back pocket eighteen months later—unless, of course, all reprimands for sexual harassment, unlike every other type of employee discipline, are to be publicly displayed.

The majority's conclusion forecasts that no matter what remedial action an employer takes when faced with a complaint of sexual harassment by a coworker, any further incident of alleged harassment by any other coworker lays the predicate for a Title VII violation. Moreover, the employee's utter failure to employ the prescribed company grievance procedure—even without a showing that it would be ineffectual—has no legally adverse impact on her claim.

The breadth of this rule is compounded by the majority's holding that the existence of sexual graffiti throughout the plant put IPCO management "on notice" of a sexually degrading work environment. From Waltman's testimony, it appears that most of the graffiti had nothing to do with her personally.[12] The graffiti was arguably non-discriminatory because it included male and female references.[13] Using evidence of generalized sexual graffiti to bolster an otherwise non-actionable complaint against an employer highlights the subjectivity of the majority's holding. As I observed earlier, sexual mores in our society are in rapid flux. Depictions that were only recently regarded as taboo in movies and television are now *de rigeur* for programs that even children will watch. The public use of lewd and suggestive language is as commonplace on the playground as in the workplace. Against such trends, it is quaint but also naive to rule that employers are legally required to eradicate all sexual graffiti from their establishments. The EEOC guidelines and policy statement never go so far. This case, moreover, is distinguishable from *Bennett v. Corroon & Black Corp.*, 845 F.2d 104 (5th Cir.1988), in which the employee was viciously satirized and suffered emotional injury solely because of the graffiti about her. Here, the graffiti are a mere addendum to Waltman's other claims. Similar graffiti probably appear on workplace walls everywhere. It is incredible to contemplate the majority's implication that the existence of sexual graffiti is sufficient to avoid summary judgment on a plaintiff's claim that her employer knew that sexual conduct was so pervasive as to alter the terms of her employment and create an abusive working environment.

Because I believe that IPCO did not have actual or constructive notice that Waltman was subjected to a pervasively abusive and

man would have been drawn into its vortex because she was the only woman working in her area.

**11.** *Compare Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307 (5th Cir.1987) (no constructive discharge where employer responded promptly to sex harassment complaint). Other courts have rejected employer liability on hostile environment Title VII claims after finding that the *employer's prompt remedial action* caused incidents to cease. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989); *Swentek v. U.S. Air, Inc.*, 830 F.2d 552 (4th Cir.1987).

**12.** With the exception of a phrase scratched in paint on one wall, Waltman simply wiped away

graffiti she found offensive. She had no idea who wrote the graffiti. The plant employed over 350 people.

**13.** The majority suggests that our decision in *Bennett v. Corroon & Black*, 845 F.2d 104, 106 (5th Cir.1988) holds that graffiti depicting both sexes somehow supports a woman's claim of a hostile environment. This implication is doubly wrong. *Bennett* dealt with the legal consequences of offensive cartoons of a particular woman employee, as the majority here inferentially acknowledge later in their opinion. More significantly, *Bennett's* suggestion that such cartoons *alone* raise a Title VII claim is pure *dicta*, as the court ultimately held that the "record presents meager proof of the conditions required by *Meritor* ..." and denied the plaintiff relief on another ground. 845 F.2d at 106.

hostile work environment, and because I believe IPCO responded promptly to each complaint that she made, I dissent from the reversal of summary judgment on Waltman's Title VII claim.[14]

14. I also disagree with the majority's holding that Waltman may prove a continuing violation of Title VII so as to avoid its 180–day limitations period. The impact in this case is not significant, because one or two physical incidents involving her occurred within the 180–day period. If her claims are actionable, no limitations bar exists. The majority's holding, however, points up a serious inconsistency in Waltman's claim. How can she have been so *unaware* that her environment at IPCO was pervasively and severely hostile, that a continuing violation occurred? Unlike *Abrams v. Baylor College of Medicine*, 805 F.2d 528 (5th Cir.1986), and cases where the discriminatory conduct is hidden from the plaintiff, Waltman had to know that she was being psychologically abused. If she did not, the credibility of her claim diminishes.

Finally, I disagree with the majority's reversal of her discriminatory promotion claim. There is no evidence that she was denied a promotion because of her sex.