**Wanderlon Ann BARNES, Plaintiff,**

v.

**Richard C. BREEDEN,
et al., Defendants.**

**Civ.A. No. H–92–0898.**

United States District Court,
S.D. Texas,
Houston Division.

Jan. 25, 1996.

Mary L. Sinderson, Houston, TX, for plaintiff.

Jennifer R. Rivera, U.S. Dept. of Justice, Washington, DC, for U.S., Arthur C. Levitt, Jr.

David H. Donaldson, George, Donaldson & Ford, Austin, TX, for John M. Doyle.

Dick Winfield, Rogers & Wells, New York City, for Associated Press.

Charles L. Babcock, Jackson & Walker, Houston, TX, David H. Donaldson, Austin, TX, for KTRK Television Inc.

Charles L. Babcock, Jackson & Walker, Houston, TX, for Capital Cities/ABC Inc.

William Wesley Ogden, Jr., Ogden, Gibson, White & Broocks, Houston, TX, for Hearst Corp.

Thomas J. Forestier, S. Jack Balagia, Jr., McGinnis, Lochridge & Kilgore, Houston, TX, for S. Beville May.

Stephen E. Toomey, Houston, TX, for Christine Monical.

Stephen J. Korotash, Asst. Chief Litigation Counsel, Washington, DC, for Joy Boddie.

Christian J. Mixter, Asst. Chief Litigation Counsel, Washington, DC, for Anna Withers.

William Wesley Ogden, Jr., Ogden, Gibson, White & Broocks, Houston, TX, for Houston Chronicle.

## AMENDED MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOYT, District Judge.

This is a civil rights case brought by Wanderlon Ann Barnes, the plaintiff. She asserts violations of Title VII of the Civil Rights Act, Title 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, Title 29 U.S.C. § 206(d)(1). Specifically, she claims that she was treated differently in the terms and conditions of employment, not fairly considered in her work assignments, subjected to sexual harassment and gender bias, and in spite of qualifications, not given a promotion that she was qualified to receive. Finally, she claims that she was not paid an equal wage for equal work.

This Court has jurisdiction over the plaintiff's claims pursuant to Title VII of the Civil Rights Act and the Equal Pay Act. After a trial to the Court, the following findings of fact are chronicled:

*The Parties and Key Actors:*

The plaintiff is a African–American female attorney, who was employed in the Houston Branch Office ("HBO") of the Securities and Exchange Commission ("SEC") from on or about August 28, 1988, until September 6, 1991, when she left the employment of the SEC and began employment with the Reso-

lution Trust Corporation on or about September 9, 1991.

The SEC is a governmental agency charged with, among other things, the regulation and enforcement of the federal securities laws. It's mission was accomplished through several field offices, including the Fort Worth District Office, formerly the Fort Worth Regional Office, ("FWRO"). The HBO was a branch office of the FWRO until approximately December 30, 1991, when it was officially reclaimed by the FWRO.

During the relevant time to the claims and defenses raised in this proceeding, T. Christopher Browne, a Caucasian male, was the Regional Administrator of the FWRO of the SEC.

Joseph C. Matta, an Hispanic male, served as the Branch Chief of the HBO from April of 1986, until October of 1987, when he was appointed the Assistant Regional Administrator serving at the HBO. He remained in that capacity until the HBO was officially merged into the FWRO. When he became Assistant Regional Administrator, Joy Boddie, an African–American female, became the Branch Chief of the HBO and remained in that capacity until August of 1990, when she transferred to the Chicago office. Nancy McGinley, a Caucasian female, succeeded Joy Boddie as Branch Chief of the HBO and maintained that status throughout the remainder of the plaintiff's employment which ended in September of 1991. Both Boddie and McGinley served as the plaintiff's immediate supervisor during their tenure and their immediate supervisor was Matta.

*Barnes' First Year:*

In August of 1988, the plaintiff interviewed with Joseph C. Matta and Joy M. Boddie for a staff attorney's position with the SEC. Barnes was employed at salary grade of GS13, Step 1 in August, shortly after the interview. Although Barnes sought a higher salary, she would not obtain it.[1] Instead, she was assured that at every opportunity she would be considered for promotion or increase. Barnes received step advances during her tenure: a GS13–3 in 1990 and a GS13–4 in 1991.

After commencing employment, Barnes was assigned at least one "case" and several "matters under investigation" ("MUI"). Barnes learned early on that to advance, a staff attorney must handle cases and MUI's that were high profile, if possible, and that statistics were gathered based on specific action taken by the staff attorney on a particular file.

In fact, the SEC office operated somewhat on a competitive basis. To be well thought of and to receive advances, promotions and bonuses the staff attorney should receive and successfully complete a case and numerous MUI's. Oftentimes, the high profile cases assured advancement and were, therefore, coveted. For every action taken on a file, the attorney received from a one-half (½) to one (1) full statistical point. Thus, the progress of the case could be tracked, as well.

One of the cases assigned to Barnes, that became focused in this dispute, was *In the Matter of John N. Ehrman* case.[2] When Barnes received the Ehrman assignment, she was to proceed with an investigation and determine what action, if any, should be taken. At this point in time, 1988, the Ehrman entities were involved in various fraudulent schemes and the schemes were ongoing. These revelations were made for the first time in July of 1989 in Barnes' initial draft of the Action Memorandum. Although the case had been around the office for some time and had been handled by Boddie and others, none had performed an adequate investigation. As a result of this Memorandum, Barnes received the highest possible rating,

---

1. Under guidelines applicable to the hiring process (Defendant's Exh. # 121) the plaintiff could have been hired at a salary 20% above that for which she was employed. In fact, the plaintiff could have been hired as at pay grade GS13, Step 3 under the applicable guidelines because her salary and benefits with the state of Texas exceeded $35,000.00 at the time that she accepted employment with the SEC.

2. Originally, the case was assigned as the Transwestern case. Through her investigation, Barnes discovered that Ehrman was the mastermind of the Transwestern scheme and several others. It was then, 1989, that the focus turned to Ehrman, who was a "crook" in deed.

"Outstanding," on her annual performance evaluation. Both Boddie and Matta received and reviewed the Memorandum and expressed the view that it was excellent.

Up to this point, neither Boddie nor Matta had done anything unusual in supervising Barnes' work product. In fact, both Boddie and Matta stated during trial that because Barnes had trial and courtroom experience, they assumed that she was well equipped to handle herself and that if she needed help they expected her to consult with them. It should be noted that neither Matta nor Boddie had the amount of trial or courtroom experience as Barnes.

During this first year, and to October of 1989, Barnes, Matta and Boddie had a friendly relationship. Although general comments about Barnes' appearance and her ancestral mix (texture of hair and color of skin) had been made by Matta, these comments were not focused or insulting. Barnes testified that the relationship between and among them changed when Barnes failed to attend the Bandera Conference held in Austin, in September of 1989. According to Barnes, an administrative officer, as opposed to a fellow attorney, was sent to ask her about attending the conference. When that officer was unable to persuade Barnes that it was important that she attend, both Boddie and Matta came separately, each making inquiry and demanding to know why Barnes would not attend the conference. It is noteworthy that Matta had not made arrangements to travel with another member of the staff and desired that Barnes either ride with him or she with him. After this exchange, and when Barnes failed to attend, Matta and Boddie changed their attitude and conduct toward Barnes.

*After the Bandera Conference:*

Shortly after returning from the Bandera Conference, Boddie wrote a short memorandum to Barnes describing certain stylistic and substantive changes that should be incorporated in Barnes' Memorandum. Later, meetings were convened and during those meetings both Boddie and Matta, for the first time, engaged in serious criticism of Barnes' work and of her personally to the point of

yelling at her. Comments such as "a smart attorney would have done this" and "even a first year attorney would have done this" were frequent statements.

The meetings often started around noon and would continue until the staff had left late in the evening. (It is noted that during this time it was known to Matta that Boddie was actively pursuing a transfer to the Chicago office and that her spot would be vacant.) The three met, in various combinations, almost daily through December of 1989. During the three month period and until May of 1990, the Memorandum was revised scores of times, mainly by Matta.

Boddie and Matta pointed out to Barnes how inadequately she was prepared to discuss the Ehrman case with them. They accused her of preparing improper discovery requests to Ehrman, although they had previously read and approved the drafts. Boddie and Matta disapproved of Barnes' return of Ehrman's document to Ehrman, although Boddie was anxious to get the records out of the office library. According to Boddie, the many boxes of business records were "cluttering" up the office.

Request for the issuance of subpoenas for bank records associated with Ehrman were denied when requested by Barnes. Later, Barnes was criticized for not having the very information that she had earlier sought through the subpoenas.

It was also during the month of October of 1989 that Adrian R. Martinez and Matta discussed Martinez's employment with the SEC. On or about November 15, 1989, Adrian R. Martinez was employed by the SEC. He was employed at pay grade GS13–3 based solely on his (Martinez) representation that he was earning $48,000.00 in his "solo" law practice. Because Martinez was practicing alone and had done so for only a few months, there was no documentation to substantiate his claim. His employment previous to his solo practice did not support his salary claim.

Martinez was assigned the ALIC insurance fraud case that involved claims of insurance and fraud by residents of the state of Louisiana.[3] Matta moved the ALIC case

---

**3.** This case originally in the Fort Worth Regional

Office ("FWRO") but was assigned to the Hous-

ahead of the Ehrman case. This action caused further delay in the completion of the Ehrman case.

An application for a temporary restraining order ("TRO") was filed in the ALIC case around March of 1990. By contrast, a TRO was not sought in the Ehrman case until June of 1990, although the necessity for one was made apparent in July of 1989, in Barnes' Action Memorandum.

Witnesses from the clerical staff testified that in reviewing Martinez's work it was poor at best. Testimony revealed that sentences were poorly constructed and contained misspelled words. According to the staff, the papers prepared in the ALIC case were prepared primarily by Matta, not Martinez. It was after the ALIC case was completed that Matta turned his attention back to the Ehrman case.

When the Ehrman investigation became public, Matta accused Barnes of lying, falsifying documents, not sending out the proper questionnaire and conspiring with the Regional Administrator, Browne, to discredit him as an attorney. This accusation came about because a copy of Barnes' Memorandum had found its way to Browne. When Barnes challenged her June 1990 evaluation, Browne's review of Barnes' Memorandum was favorable. This event antagonized Matta.[4] Matta's, Browne's and Boddie's explanations in these areas is found incredible and refuted by other testimonial and documentary evidence.

*The SEC's Knowledge of Work Environment:*

During her second year, Barnes served as Federal Women's Program Coordinator, a position previously occupied by Boddie. She was approached by several of the women in the office concerning matters that she felt were serious. These complaints involved the working conditions of the secretaries, favoritism and sexual harassment by senior officials in the HBO and FWRO offices. When these matters were brought to Boddie's and Matta's attention, Barnes was met with yelling threats that she could lose her job. Matta was condescending.

In June of 1990, Barnes met and discussed with Browne the difficulties that she had and that others had confided in her about Matta. The race issue and sexual harassment concerns that Barnes and others had were disclosed to Browne.

Specifically, Barnes and several female employees complained that Matta had gotten them in a one-on-one situation in his office or other isolated places and engaged in sexual and vulgar acts. According to testimony, Matta attempted to embrace Barnes on one occasion and on another opened Coral Ramirez's jacket attempting to expose her breast. Either in his office or that of the female staff, Matta would sit back in his chair and open and close his legs back and forth in a rapid fashion while looking down toward his crotch. Barnes, Monical and Ramirez all related having experienced this conduct.

Matta described his back and forth leg action as a "twitch" of his leg or knee caused by nervousness or stress. He denies that it ever happened in Monical's presence. He denied opening Ramirez's jacket and insisting on having lunch with her. He also denied making throaty groaning noise, designed to attract Ramirez's attention. The Court finds Matta's explanation wanting in truth. Such nervousness was never displayed during the many days of trial.

Other offensive acts were also related during trial testimony. Ramirez related sexually offensive conduct on the part of Edwin Tomko when he was Branch Chief of the HBO. Tomko had joked, in her presence, that Boddie had been interviewed at a hotel by Wayne Secord. She observed Tomko place his hand on Boddie's thigh on one occasion and Secord kiss Boddie on another.

ton Branch Office ("HBO") by Christopher Browne the Regional Administrator. Browne testified that he instructed Matta to give priority to the case.

4. It is undisputed and common knowledge that Matta's approval was required on all communi-

cation that left the HBO. In the instances that Matta critiqued Barnes' work it was either direct or through Boddie and, according to the evidence, did not result in any material substantive changes as evidenced by a comparison of the plaintiff's exhibits 39 and 40.

During this time Matta was a staff attorney. Ramirez had confided in Barnes, Boddie, Monical and Sloan. Only Barnes attempted to help Ramirez by relating Matta's conduct to Browne of the FWRO and Miller in the EEO office. Miller simply told Ramirez to get her brother to beat up on Matta. Boddie and other female attorneys told Ramirez to learn to go along and get along.

Ramirez's complaint and Matta's conduct were not recent revelations to the SEC. Four years earlier, in 1986, Ramirez had reported Matta's sexual harassment to Browne, the Regional Administrator. Browne slammed the door on Ramirez's complaint by letter and she was not heard from again until Barnes took her concerns seriously in 1989.[5] Browne's conduct in this regard was incredible.

When Matta learned of the Barnes–Browne meeting, matters got worse for Barnes. The alleged lack of trust in Barnes' work intensified leading Matta to question every proceeding and to attempt to disprove every fact that Barnes stated in her Memorandum. For example, certifications from the Texas Railroad Commission were obtained by Barnes stating that Ehrman's companies had not drilled and were not operating any oil and gas wells in Texas.[6] This official document was not sufficient for Matta. He challenged Barnes and then commenced a letter campaign to the Railroad Commission demanding that they provide him with a letter that would accord with his personal standards, i.e. that the Railroad Commission was personally assuring him that Ehrman had no wells operating. This failed, of course, and Matta eventually accepted the certifications.

Finally, in May of 1990, Matta spent four (4) weeks reviewing the Enforcement Memorandum in preparation for final court documents. This final review by Matta came almost two (2) months after Boddie told him

(March 1990) that the case was ready for filing. Nevertheless, it was not filed because, according to Matta, other investigations were needed. Ironically, Matta testified that he maintained confidence in Barnes' ability and, therefore, kept her on the case.

*Other Evidence of Sexual Misconduct:*

During the trial, Anna Withers also described a sexual relationship between herself and an unnamed male employer out of the FWRO that occurred in 1986. The encounter as related by Withers to Barnes, Credit, Williams, Robinson and other females as an unpleasant one where she had been forced to engage in non-consensual sex. She testified at trial, however, that the sex was consensual and related that Barnes and others were mistaken in their conclusions. Independently of Barnes, Monical related that the same incident had been related to her by Withers.

Monical also corroborated the fact that much of the male conversation around the office was sexually oriented and suggestive about the females in the office and those visiting the office. She testified that Matta had engaged in the same conduct with her as he had with Barnes and Ramirez. She related that Tomko, then Branch Chief, threatened to fire her if she did not accommodate his sexual desires. According to Monical, Tomko also set up a dinner for herself, Tomko and Secord knowing that he, Tomko, would not show up and that Secord was expecting sexual favors. While waiting for Tomko, Secord suggested to Monical that there was a motel down the street where they could continue their discussions.

Matta categorically denied the charges made by Barnes, Monical and Ramirez. He denies unnecessarily removing staff and attorneys from the Ehrman case and placing them on the ALIC case. He admits that he told the staff that the ALIC case was to be given priority.[7] He testified that Barnes

---

**5.** In the letter Browne relates:

"There is little probative evidence supporting Ms. Ramirez's allegations, all of which Mr. Matta denies. Assuming that both Mr. Matta and Ms. Ramirez are telling the truth as each sees it, Ms. Ramirez is deluding herself, perceiving sexual harassment by Mr. Matta where none exists...." (Plaintiff's Ex. 60).

**6.** Ehrman had sold stock in his company(s) on the pretense that he was drilling oil and/or gas wells. In fact, he was not drilling or operating any wells.

**7.** The record shows that the SEC was anxious to beat the Louisiana Attorney General into Court on this matter. In Matta's and Martinez's haste,

failed to follow his and Boddie's instructions and denied sending a copy of Barnes' Memorandum to Browne in the FWRO for critical review.[8] He testified that Barnes had overstated or misstated the facts in the Ehrman case, failed to get clear answers in the discovery request, was too argumentative, and stayed on the telephone too much. Thus, her poor performance created her lower rating in 1990.

Matta admits that he went to Martinez after Martinez received an "Outstanding" rating in 1990 and discussed giving Martinez a promotion to pay grade GS14. He admits that he did not make this effort with Barnes or ever notify her that the pay grade was available.[9] In fact, he does not recall telling Barnes what she should do to get promoted. According to Matta, it was Browne's idea to promote Martinez. According to Browne, he only approved Matta's recommendation after Matta prepared all of the paperwork including Browne's memo to the Acting Director of Personnel seeking Martinez's promotion. (See Pl.Exh. # 25)

## II. CONTENTIONS OF THE PARTIES

*Plaintiff's Contentions:*

The plaintiff contends that during her employment with the SEC, she experienced discrimination in the terms and conditions of her employment and that she was the victim of race and sex discrimination by the SEC. She contends that she was hired at a lower rate of pay grade (GS13–1) than a male attorney (who was hired at pay grade GS13–3), that she was denied a promotion from pay grade GS13–4 to pay grade GS14–1 as a result of this discrimination, that she was subjected to terms and conditions of employment that were intentionally discriminatory, and that she was sexually harassed by the Assistant Regional Administrator, Joseph C. Matta, who was in charge of the HBO. Further, the plaintiff contends that when she refused Matta's sexual advances and when she protested his racially and sexually discriminatory behavior to other officials in the SEC, the agency as well as Matta retaliated against her with unwarranted criticism, work showdown, rude, insulting and offensive behavior, work sabotage and a scheme to discredit her, which created a hostile work environment and caused her discharge.

She also contends that as a result of the discriminatory conduct of the defendants, she suffered monetary losses when she was forced to work at a lower wage than a male attorney with less experience but performing similar duties as the plaintiff, and when she was denied a promotion to pay grade GS14.[10] Further, she contends that such disparity in pay was not based upon good faith conduct or reasonable grounds for believing that such would not violate the Equal Pay Act. She contends that such disparity in pay was hidden from her until May of 1991.

As well, the plaintiff alleges loss of contributions to retirement benefits that were commensurate with the pay of which she was wrongfully denied. She contends that she suffered intangible injuries, physical illnesses, stress reactions, embarrassment, humiliation and mental anguish as a result of the SEC's discriminatory conduct. (See Pl.Exh. # 51).

they filed the suit in the wrong District in Louisiana causing a venue problem.

8. The record shows that Matta did in fact send the Memorandum to Browne and commented to Browne favorably about it. This all occurred before Ramirez interviewed and came to work for the HBO.

9. The reason given by Joseph C. Matta for not hiring the plaintiff at pay grade GS13, Step 3, was that she would have no eligibility for future promotions. This is untrue and a pretext to discriminate against the plaintiff in the terms and conditions of her employment on the basis of her race and/or gender. Virtually all of the employment decisions made by Matta during the plaintiff's employment at the SEC were approved or ratified by the Regional Administrator, T. Christopher Browne and there was never an indication that he would not get whatever he requested from Browne.

10. The plaintiff became eligible for a promotion to pay grade GS14 on October 1, 1989. Matta failed to apprise the plaintiff of the fact that the rules governing eligibility for promotion to this pay grade had changed effective October 1, 1989. Instead, he withheld this information and created conditions that insured that the plaintiff would not be considered for the promotion.

The plaintiff also contends that she is entitled to an award of attorneys' fees for legal representation at the administrative level and for the prosecution of this suit.

In response to the SEC's claims that the 1991 Civil Rights Act does not apply to this case, the plaintiff contends that under controlling Supreme Court precedent, the 1991 Civil Rights Act applies to this case because her administrative claim was pending on the effective date of the 1991 Act.

*Defendants' Contentions:*

As a threshold matter, the SEC contends that this Court lacks subject matter jurisdiction over the plaintiff's Title VII claims and common law claims against the United States. With respect to the plaintiff's Title VII claims, the SEC denies that it intentionally discriminated against or harassed the plaintiff either on the basis of her race or sex. As well, it disputes that it retaliated against her or constructively discharged her. The SEC further denies that it illegally paid the plaintiff less than a male attorney on the basis of gender for work requiring equal skills effort and responsibility and which was performed under similar working conditions.

Further, the SEC contends that the plaintiff's demand for injunctive relief must be stricken because the plaintiff is no longer an employee of the SEC and does not seek reinstatement. Moreover, the SEC office in which the plaintiff worked is now closed, and her former supervisor is no longer serving the SEC in a supervisory capacity. Thus, there is no injunctive relief which this Court could order against Joseph C. Matta or against the SEC that would enjoin any future potential irreparable harm to the plaintiff.

With respect to the plaintiff's demand for relief, the SEC contends that the Court should strike her request for compensatory damages because the controlling precedent of this Circuit holds that the Civil Rights Act of 1991 ("1991 Act") is not retroactive, thus, the 1991 Act's remedies are not applicable to her. In any event, the SEC claims that this Court should strike the plaintiff's demand for punitive damages as those damages are not permitted under the Title VII, the Equal Pay Act, or the Federal Tort Claims Act against the United States or any agency of the federal government.

*Discussion:*

At the outset, the Court must address two procedural limitations issues raised by the SEC that the plaintiff's suit should be dismissed for lack of jurisdiction. First the SEC charges that the plaintiff failed to bring the offending conduct to the attention of an EEO counselor within 30 days. Next, assuming that it is incorrect on the first claim, the SEC argues that the plaintiff failed to exhaust the administrative remedy available to her and did not timely bring suit. As a final defense, the SEC asserts that the Civil Rights Act of 1991 is inapplicable. These claims will be addressed in turn.

■ The authorities in this Circuit support the view that any claim of untimeliness in filing a charge of discrimination with the SEC may be waived. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Munoz v. Aldridge,* 894 F.2d 1489 (5th Cir.1990). In *Munoz,* the Air Force set out to and did an extensive administrative investigation concerning the charges made by the complainant. Later, the Air Force asserted untimeliness as a defense to the *Munoz's* claims. The Court refused to enforce this limitation holding that the time limits for giving notice or filing an administrative complaint are subject to equitable tolling. *Id.* at 1494.

■ Here, the SEC conducted an extensive investigation, which included the taking of numerous depositions by and of SEC personnel, that was not completed until December of 1991. As in *Munoz,* the 30–day limitation set by regulations for bringing discriminatory conduct to the attention of an EEO counselor cannot be enforced because the conditions that existed at the HBO were of a continuing nature. Moreover, the Regional Administrator knew about the complaints because the complaints had been repeated by the plaintiff and Ramirez in private meetings with him.[11] There is no doubt that the SEC

---

11. Barnes' word alone would never be enough to convince Browne or the EEO office that Matta

was engaged in sexual harassment because his

was fully aware of the work environment at the HBO, enough so to place the SEC on notice of what the plaintiff's claims were. *See Brown v. Marsh,* 777 F.2d 8, 14 (D.C.Cir. 1985).

▉ The Court also holds that the plaintiff sufficiently exhausted the administrative procedures available to her. The SEC's complaint centers on the argument that the plaintiff refused to give her deposition after agreeing to do so.

The record shows that the SEC had essentially completed its investigation but wanted Barnes' deposition. The last agreement setting the deposition was cancelled due to Barnes' illness. The fact that the SEC wanted to close its investigation with Barnes' deposition and was unable to get the deposition within the SEC's timeframe is no reflection on Barnes' cooperation. The SEC's record is replete with evidence of wrongdoing. Moreover, the "take-it or leave-it" approach by the SEC had nothing to do with Barnes' effort to provide all of the information that she had.[12]

The Court holds that the plaintiff acted in good faith, even though with a healthy degree of skepticism, concerning the process, and made reasonable efforts to provide the necessary relevant information to the SEC. *Wade v. Secretary of the Army,* 796 F.2d 1369 (11th Cir.1986). Unfortunately, the SEC rejected the message and the messenger.

▉ Next, the Court turns to the question of whether the Civil Rights Act of 1991 is applicable to the plaintiff's case. The SEC correctly states the law of the Circuit, that § 102 of the 1991 Act is not to be applied retroactively. *Valdez v. San Antonio Chamber of Commerce,* 974 F.2d 592 (5th Cir. 1992). Thus, the salient question is when did the act or acts giving rise to the plaintiff's claims occur, and does the fact that they

were continuing with respect to the hostile work environment and pay differential make a difference.

▉ The undisputed facts support the conclusion that if the plaintiff were discriminated against prior to 1991, with regard to salary adjustments and promotions and hostile work environment, the situation continued until her separation from the SEC in September 1991. It appears that even though the racial discrimination commenced in October of 1989 it ceased, as to the plaintiff upon her separation in 1991.

In the case at bar, the conduct that the plaintiff sues about commenced in October of 1989 and continued until her separation from the SEC in 1991. Therefore, the Court holds that the conduct complained about, although occurring in 1991, ceased as to the plaintiff before the effective date of the Civil Rights Act of 1991. The Court turns now to the substantive issues.

*The Substantive Issues:*

▉ Unwelcomed sexual advances that create an offensive or hostile work environment violates Title VII. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). As well, Title VII prohibits discrimination in the terms and conditions of employment based on the sex or gender of an employee. *Id.* at 63, 106 S.Ct. at 2403–04. For sexual harassment to be actionable, it must be sufficiently severe or pervasive as "to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. at 2405 (*citing Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

▉ Sexual harassment generally falls into one of two categories: *"quid pro quo"* where sexual favors are sought in exchange for a promotion or other advancement or compensation and "hostile environment" where the workplace is permeated with discriminatory

---

conduct was always displayed in private (See footnote 4 *supra*).

**12.** Prior to setting Barnes' deposition, the SEC issued a press release on December 30, 1991 stating that it had completed its investigation and that there was "absolutely no evidence that Mr. Matta engaged in any of the sexual offenses that

were alleged." (Pl.Exh. # 62). On February 20, 1992, the SEC cancelled the plaintiff's complaint of race and sex discrimination and forwarded a copy to both the plaintiff and her attorney. Assuming that the letter was received on February 20, a pleading filed on March 23 would be timely. *See* FRCP 6(a).

intimidation, ridicule, and insults that severely alters the condition of the victim's employment. *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The latter often results from rejection by the victim and a clear statement that the harasser's conduct will not be tolerated.

■ Of further importance is the determination of whether the offensive and illegal conduct is meted out by a co-worker or a supervisor. In the latter, where the harasser is a supervisor, the case law and regulations require the victim to prove that the supervisor's conduct falls within the scope of the supervisor's employment, or that the harassing actions were foreseeable. *See Kauffman v. Allied Signal, Inc., Autolite Div.,* see also 29 C.F.R. § 1604.11(e).

In the case at bar, the SEC stipulates that Matta was engaged in the course and scope of his employment at the relevant periods of time associated with the plaintiff's claims. Thus, it was Matta's job as Assistant Regional Administrator of the HBO to meet with, supervise and direct the conduct and work product of each of the employers of the HBO. Therefore, the Court concludes that the actions of Matta were associated with the duties of his employment.

■ But, it is equally compelling that Matta's conduct was foreseeable by Browne although foreseeability need not be proved by the plaintiff. He had, as well as other supervising male employees, engaged in illegal conduct for years. The facts show that the HBO supervisor's conduct, as well as that of several men in the FWRO, created an environment where the female either submitted or was ridiculed. Specifically, the conduct of Edwin J. Tomko and T. Christopher Browne, both administrators at the FWRO, either by omission or commission engaged in sexually harassing the plaintiff and other female staff. Efforts to bring the female staff's concerns to the FWRO and the Office of General Counsel were met with ridicule and lackluster concern. For example, the EEO Counselor was told of Matta's retaliatory conduct toward Barnes, yet no formal complaint was accepted. Nor are there any documents establishing efforts to investigate the complaint.

■ The foreseeability aspect of Matta's conduct is also proved by the fact that his supervisor, Browne, knew of the charged conduct starting with Ramirez in 1986. He took no meaningful action to implement appropriate corrective action. *See Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 621 (6th Cir.1986) *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).[13] Title VII affords an employee the right to work in an environment free from discriminatory intimidation, ridicule and insult. *See Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Browne not only failed, he aided and abetted the illegal conduct.

■ The plaintiff's testimony, as well as that of corroborating witnesses, also establishes the pervasive nature of Matta's conduct. Clearly, his malicious conduct created and perpetuated a hostile working environment, primarily because he could not have his way with the female staff. Without doubt, the females in the HBO were terrified that the conduct of the men, especially Matta, if exposed, might cost them their jobs. Boddie refused to assist Ramirez, although it was her job to do so, when Ramirez sought protection and advice concerning Matta's conduct in 1986. Ramirez was left to fend for herself. It was Barnes, who took on Matta and Browne only to be rebuffed and further harassed. These several men in the HBO and the FWRO used their power and positions to intimidate to the point of forcing several female employees to engage in sexual activities that the females felt compelled to engage in in order to save their careers. These "official despots" create a hostile working environment affecting the plaintiff's and others ability to perform their jobs. *See Waltman v. International Paper Company,* 875 F.2d 468 (5th Cir.1989).

**13.** A plaintiff prevails if she can show that her employer, through its agent or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt corrective measures. *Id.* at 621.86156068Cr

Matta's conduct was also racially motivated. The record shows that Matta succeeded Michael Rodriguez as Branch Chief in 1986, when Rodriguez became the Assistant Regional Administrator. In 1987, when Matta became the Assistant Regional Administrator, Joy Boddie, a black female, became the Branch Chief. The evidence shows that the compromise by Matta, necessary to secure his own position, did not please him and he immediately set out to discredit Boddie. It was commonly known among the female staff that Matta had little or no respect for Boddie or her work product. He openly expressed his displeasure with her as Branch Chief and undermined her leadership. The facts show and one may reasonably conclude that she was so intimidated by Matta's ridicule and insults, that she refused to give legal advice or comfort to the female staff that sought her guidance. When Matta learned of Boddie's desire to transfer to Chicago, he set out to employ an Hispanic male.

In October of 1989, after giving glowing reviews to the plaintiff's work product and rating her "Outstanding" on the performance rating, Matta turned foul on the plaintiff. Adrian R. Martinez, who had been reprimanded by the State Bar of Texas, had no verifiable income upon which a starting salary could be based, and had never tried a major case, civil or criminal, was started at a salary equal to that earned by the plaintiff, although she had been with the SEC over a year.[14] The evidence shows, and if Matta and the SEC had checked they could have learned that Martinez had made serious misrepresentations on his application. These misrepresentations went beyond negligence and were in fact intentional in nature, specifically designed to effectuate a given salary for Martinez.

At the time Martinez was considered for employment, the plaintiff was, according to Matta, an excellent employee. In less than three (3) weeks, the plaintiff's rating went from excellent to incompetent. Matta's subsequent favoritism toward Martinez was unyielding. Martinez was recommended for and received a $750 cash award nine months later for his work on the ALIC case.[15] He was permitted a "lit" release (press release) on the case and also received an increase to GS13–4 three (3) months after the plaintiff received the increase. On February 12, 1991, 15 months after being employed, Martinez was promoted ahead of the plaintiff to grade GS15, a grade that the plaintiff had been told was not available to her.

It was during this same period of time that Matta intimidated the plaintiff and mocked her work. After the plaintiff brought these matters concerning pay and sexual harassment to the attention of Matta's superior, Browne, Matta's inappropriate conduct intensified. By way of example, Matta would yell at the plaintiff, threaten to fire her, accused her of lying and creating false documents and conspiring with Browne to discredit him. On occasion when he would pass the plaintiff in the hallway, Matta would give the plaintiff a mean and scurrilous gaze while clinching his fists.

To further intimidate the plaintiff, Martinez was permitted to sit in and participate in Matta's critique of the plaintiff's work. Yet, neither the plaintiff nor Boddie sat in with Matta to critique Martinez's work. On one occasion, Matta and Martinez sat in when the plaintiff interviewed Ehrman. During the interview Matta and Martinez pushed away from the conference table and began laughing behind Barnes' back. Ehrman became so upset and offended that he walked out of the meeting thinking that the conduct of the two was an indication that he, Ehrman, was being "set-up," for criminal charges. Clearly, the business of the SEC is more important than Matta's to frustrate one female.

---

14. The plaintiff had significant litigation experience as an Assistant Attorney General for the state of Texas, in the Houston office prior to her employment with the SEC. Thus, her trial and investigative experience prior to her employment by the SEC was equal to, or greater than, the trial and investigative experience of Jean Spradling Hughes, a Caucasian female who was employed one year prior to the plaintiff's employment at pay grade GS13–6 at $46,086.00.

15. Clerical staff testified that Matta actually did all of the work but simply gave the credit for the work to Martinez. The records supports this testimony.

The reasonable inferences and conclusions to be reached from this conduct is that Matta sought to position Martinez to replace Boddie as Branch Chief of the HBO. Matta knew of Boddie's desire to transfer to the Chicago office. Boddie did, in fact, transfer in August of 1990, only to be replaced by Nancy McGinley. Matta was prepared to and performed every trick to undermine Barnes, who was on track to be considered for any promotion ahead of Martinez. After all, she had more trial and courtroom experience than Matta and Boddie and Martinez together.

According to Ruby Credit, Matta did not deny his prejudice against the plaintiff. Credit testified that Matta would sit on the plaintiff's work indefinitely and then complain to Credit that Barnes was not fast enough. She testified that Matta would pull the clerical staff off Barnes work even when no emergency existed, so that others' work could be done. Subpoenas prepared by Credit, that were passed to Matta, never went out. Matta's reply to Credit about his conduct toward Barnes was that he had connections and nothing was going to happen to him.

The Court is of the opinion and holds that Matta's conduct represented a pattern and practice of discrimination against the plaintiff based on both her gender and race. Although it commenced in October of 1989, it continued to the date of her exit in September of 1991. These racial and gender violations created a hostile working environment that affected the plaintiff's ability to perform her work. *See Waltman v. International Paper Company,* 875 F.2d 468 (5th Cir.1989). *See also Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

Moreover, there is no doubt that Matta's supervisor knew of his conduct as early as 1986. Browne chose to duck the issue by telling the victim to try and get along with Matta. When the problems persisted and the total work environment became unconscionably turbulent in 1989 and 1990, Browne failed to implement any strategy beyond the "now, now, big fellow" attitude toward Matta's illegal conduct. Corrective action was required, yet none was taken. *See Kauffman v. Allied Signal, Autolite Division,* 970 F.2d 178 (6th Cir.) *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992).

The Court is also of the opinion that the plaintiff experienced emotional distress that manifested itself in sleeplessness, depression, nervousness and physical symptoms such as digestive disorder, headaches, rashes and swelling. The emotional distress and physical symptoms that the plaintiff experienced were directly caused by the discriminatory conduct directed toward her by Matta and permitted by Matta's supervisors. These findings are supported by Dr. Bell's findings and conclusions that stand unchallenged in the record. (See Pl.Eh. # 51).

The plaintiff incurred medical expenses for treatment of the physical symptoms that she suffered from the hostile and discriminatory work environment at the SEC. The plaintiff should be compensated for the psychological damages and expenses that she suffered at the hands of the SEC.

■■■■■ The plaintiff's experience and prior salary with the state of Texas permitted the plaintiff to commence employment at pay grade GS13–3, but for the racial and gender prejudice practiced by Matta.

■■■■■ Finally, the Court holds that the plaintiff was constructively discharged from her employment. The conduct of Matta, McGinley, Browne and Webster created such a hostile atmosphere that Barnes and others could no longer tolerate the working conditions at the HBO.

*Conclusion:*

The Court finds and holds that the plaintiff's right to work in an environment free from sexual harassment, gender bias and racial discrimination was violated. The discriminatory intimidation, ridicule and insults, meted out by Matta directly and through the supervisors that answered to him, were of such severity that it pervaded the entire work force and altered the conditions of employment of the plaintiff and others, resulting in an intolerable work environment, in violation of Title VII.

The Court, therefore, shall award damages in accordance with Title VII for sex and race discrimination, the Equal Pay Act, a reasonable attorneys fee, and costs of court.

It is so ORDERED.